AO 91 (Rev. 11/11)  Criminal Complaint

**FILED**

# UNITED STATES DISTRICT COURT
for the
Northern District of California

MAR 04 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

| United States of America | ) |
|---|---|
| v. | ) |
| Donald Siao, | ) Case No. |
| | ) |
| | ) |
| *Defendant(s)* | ) |

CR 21 70412 MAG

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  2018: 2/26, 6/18, 4/10, 5/16, & 5/9  in the county of  Santa Clara  in the
Northern  District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Counts 1-4: 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); Counts 5&6: 18 U.S.C. § 1347 | Counts 1-3: Distribution of hydrocodone; Count 4: Distribution of oxycodone; Counts 5&6: Health care fraud<br><br>Penalties:  Counts 1-4: Maximum 20 years imprisonment; supervised release minimum 3 years, maximum life; $1,000,000 fine; $100 special assessment<br>Counts 5&6: Maximum 10 years imprisonment; supervised release term of 3 years, $250,000 fine; $100 special assessment |

This criminal complaint is based on these facts:

See affidavit of DEA Task Force Agent David W. Brown, attached hereto and incorporated by reference

☑ Continued on the attached sheet.

/s/ Brown/SvK w/ permission
*Complainant's signature*

Approved as to form  *Sarah C. Griswold*
AUSA Sarah Griswold

David W. Brown, Task Force Agent, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  March 4, 2021

*Susan van Keulen*
*Judge's signature*

City and state:   San Jose, CA

Susan van Keulen, U.S. Magistrate Judge
*Printed name and title*

| Print | Save As... | Attach | Reset |

365

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, David W. Brown, hereby duly sworn, declare and state:

### INTRODUCTION

1. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. I make this affidavit in support of a Criminal Complaint charging **Donald Siao** with three counts of distribution of hydrocodone in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Counts 1, 2, and 3), one count of distribution of oxycodone in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count 4), and two counts of health care fraud in violation of 18 U.S.C. § 1347 (Counts 5 and 6).

3. The facts in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses. In addition, where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records are referenced in this Affidavit, such information is also described in sum and substance and in relevant part.

4. Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint, I have not included each and every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support probable cause for a criminal complaint.

### AGENT BACKGROUND

5. I have been employed by the FBI as a Special Agent since November 2009 and am currently assigned as a Task Force Agent to the Drug Enforcement Administration (DEA), San Francisco Field Division, Oakland Resident Office, where I am assigned to the Tactical Diversion Squad. While serving as an FBI Special Agent, I have participated in investigations of illicit drug trafficking organizations. Prior to working as an FBI Special Agent, I attended and graduated from the FBI New Agent Training Program in Quantico, Virginia. At the FBI New Agent Training Program, I received several hundred hours of comprehensive, formalized instruction in the recognition, distribution, manufacturing, and packaging of controlled substances, as well as money laundering techniques, asset forfeiture, and weapons-related crimes. I have completed several courses offered by the California Narcotics Officers Association. As an FBI Agent I have been assigned to squads focusing on violent crimes and drug trafficking, violent crimes against children, domestic terrorism, international terrorism and currently a DEA Task Force.

6. In my current assignment, my duties include investigations into the diversion of controlled substances. In normal circumstances, controlled substances travel in a controlled manner. The controlled substance will start with the manufacturer, and then it goes to the distributor, then to a doctor, pharmacy, or other registered agent who can dispense the controlled substance legally. The controlled substance finally goes to the consumer, *i.e.*, a patient who has a valid prescription for the controlled substance. The controlled substance can be diverted anywhere along this route. When the controlled substance is diverted from this route, it is my job to investigate the diversion. The investigation can focus on a doctor, pharmacy, or even the customer. Investigations can involve analysis of the Controlled Substance Utilization Review and Evaluation System (CURES), which is a prescription drug monitoring program, run by the state of California, undercover operations, surveillance, phone toll analyses, and search warrants to obtain evidence of the diversion of controlled substances.

## APPLICABLE LAW

7. Title 21, United States Code, Section 841(a)(1) makes it unlawful for any person to knowingly distribute a controlled substance, including hydrocodone and oxycodone. Under 21 C.F.R. § 1308.12(b)(1), hydrocodone and oxycodone are Schedule II controlled substances. To convict a medical practitioner under § 841(a), the government must prove that (1) the practitioner distributed controlled substances, (2) the distribution of those controlled substance was outside the course of professional practice and without a legitimate medical purpose, and (3) the practitioner acted with intent to distribute the drugs and with intent to distribute them outside the course of professional practice.

8. Title 18, United States Code, Section 1347 makes is unlawful for any person to knowingly and willfully execute a scheme or plan to defraud a health care benefit program by means of material false or fraudulent representations in connection with the payment for health care benefits, items, or services.

## STATEMENT OF PROBABLE CAUSE

9. At all times relevant to this affidavit, Donald Siao was a physician licensed to practice medicine in the State of California and authorized by the Drug Enforcement Administration (DEA) to prescribe Schedule II-V controlled substances. At all times relevant to this affidavit, Siao conducted his medical practice in San Jose, California.

10. As discussed below, the DEA, the California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse (BMFEA), and the Department of Health and Human Services Office of Inspector General Office of Investigations (HHS-OIG-OI) (collectively "the Investigative Agencies") have been investigating the prescription practices of Donald Siao.

11. In May 2017, BMFEA identified Siao as a high prescriber of oxycodone 30 mg while reviewing CURES data. From May 2016 to May 2017, CURES records showed Siao wrote 8201 prescriptions for controlled substance medication, including large quantities of 30

mg oxycodone, and multiple instances of combinations of an opioid, muscle relaxant, and benzodiazepine that public health authorities have warned are dangerous.[1]

12. The Investigative Agencies sent four undercover law enforcement agents (UC-1, UC-2, UC-3, and UC-4) to meet with Siao at his medical practice in San Jose, California. Siao prescribed Schedule II controlled substances to each UC. Each of these prescriptions was outside the course of professional practice and without a legitimate medical purpose.

**Count 1: Distribution of Hydrocodone to UC-1 on February 26, 2018**

13. UC-1 had her first appointment with Siao on September 19, 2017. During the appointment, UC-1 told Siao that she spends most of the day on her feet at work and was hoping to get a prescription for Norco, which is a brand name for hydrocodone-acetaminophen. Siao asked UC-1 a series of questions about her medical history including whether she uses or has allergies to any medications, if she sees other specialists, if she has had any hospitalizations and whether she smokes.

14. Siao then asked UC-1 where she had pain specifically, and suggested her ankles or lower back. UC-1 gave vague answers to which Siao responded that he needed to "justify these things" due to increased regulatory scrutiny related to "the opioids." Siao did not conduct any physical examination of UC-1 during this visit or any of her subsequent four visits.

15. At the end of her first visit, Siao gave UC-1 a prescription for 45 tablets of 10 mg Norco. Over the next three appointments, Siao regularly warned UC-1 to be careful and not to take too many pills despite consistently increasing the number of Norco tablets he prescribed by 15 during each visit.

16. On her fifth and final visit on February 26, 2018, UC-1 asked Siao for a prescription for Xanax, which is a brand name for alprazolam. Siao offered UC-1 30 tablets of 0.5 mg strength Xanax. UC-1 told Siao she was used to the 1mg strength she had received before from a friend, and asked for the higher strength. Siao wrote a 1mg Xanax prescription in addition to a prescription for 90 tablets of 10 mg Norco.

17. Siao did not conduct any physical examination of UC-1 during any of her visits.

**Count 2: Distribution of Hydrocodone to UC-2 on June 18, 2018**

18. UC-2's first appointment with Siao was on January 22, 2018. During the appointment, Siao asked UC-2 a series of questions about medication and family medical history. UC-2 told Siao that he wanted a prescription for Norco to deal with pain related to his work.

---

[1] The term "Holy Trinity" is sometimes used colloquially to refer to the prescription of a combination of drugs comprised of a benzodiazepine, an opioid, and a muscle relaxant. The combination is especially dangerous because each of those medications depress the central nervous system and the ability to breathe.

3

19.     After performing a brief physical examination lasting approximately eight seconds in which Siao briefly palpated UC-2's elbow, Siao concluded that UC-2 had tennis elbow or golfer's elbow. Siao did not perform any medical examination during any of UC-2's subsequent three appointments.

20.     Siao told UC-2 that he preferred to start patients on non-opioid medications. UC-2 said he had tried those, but had received Norco from his friends and found them effective. Siao then told UC-2 about the addictive properties of opioids and wrote him a prescription for 30 tablets of 10 mg strength Norco.

21.     UC-2's second appointment with Siao was on April 10, 2018. At one point during the appointment, Siao asked UC-2 if he had ever had any X-rays done on his elbow. When UC-2 said that he had not, Siao responded "okay…let's not get too far into it." He then wrote another prescription for 30 tablets of 10 mg strength Norco.

22.     UC-2's third appointment with Siao took place on May 17, 2018. UC-2 asked to increase his prescription to 70 tablets because he had given some his pills to employees as an incentive to ensure they showed up for work. Siao responded by saying "Oh God, I'm sorry. So, yeah, well, okay, so 75, is that what you're saying, 75?" UC-2 stated that 70 was sufficient and Siao agreed. Siao wrote the prescription for 70 tablets of 10 mg strength Norco.

23.     UC-2's fourth and final appointment with Siao was on June 18, 2018. UC-2's interaction with Siao during the appointment lasted approximately 2 minutes and ten seconds. During the appointment, UC-2 requested his prescription be increased to 90 tablets because he had run out during a concert he attended out of state and had to visit a local clinic for refills. Siao said that he could not prescribe more than 100 tablets because the "DEA is really cracking down on doctors not prescribing too much of [opioids][sic]." Siao then wrote UC-2 a prescription for 90 tablets of 10 mg strength Norco.

**Count 3: Distribution of Hydrocodone to UC-3 on April 10, 2018**

24.     UC-3's first appointment with Siao was on February 26, 2018. During the appointment, UC-3 told Siao that he wanted to get established as a patient and get a prescription for 10 mg strength Norco. When Siao asked about his pain, UC-3 provided vague answers. Siao then discussed the "quote unquote opioid crisis" with UC-3, and said that the DEA was aggressively regulating prescribers and pharmacies. Siao said that he needed UC-3 to sign a pain contract and undergo urine drug screening, and that the DEA monitors which pharmacies fill UC-3's prescriptions. Siao stated it was "kind of like big brother watching."

25.     After asking a series of general medical history questions, Siao ordered, and a medical assistant conducted, an electrocardiogram (EKG) on UC-3. Siao then briefly monitored UC-3's heart and lungs with a stethoscope and palpated UC-3's legs for less than one second. After the brief physical exam, Siao said he would write a prescription for 45 tablets and asked if that would be okay with UC-3. UC-3 concurred. Siao also said he would give UC-3 a lab slip for a blood test.

4

26. UC-3 explained that he would rather come to Siao for Norcos instead of getting them from colleagues at work. Siao inquired how much UC-3 had been paying and UC-3 answered ten dollars a pill. Siao then stated "That is nuts. Well, you know what, well, I'm not going to say anything. Some people try and make a business out of that; put it that way." Siao then wrote UC-3 a prescription for 45 tablets of 10 mg strength Norco.

27. UC-3's second appointment with Siao was on April 10, 2018. During the appointment, UC-3 said that he had run out of Norco and had to borrow from others since his last appointment. UC-3 asked Siao to increase his dosage to 60 tablets in order to pay back the person from whom he had borrowed. Siao wrote UC-3 a prescription for 60 tablets of 10 mg strength Norco.

28. Also during his second appointment with Siao, UC-3 mentioned that he had a new employer who conducts drug testing. UC-3 said that he smokes marijuana from time to time and asked for a prescription for Marinol. Marinol is a brand name for dronabinol, which is a cannabinoid and could be used as a pretext to explain a positive test for marijuana. Siao confirmed that UC-3 would not actually be taking the Marinol. UC-3 said no and asked for the prescription to be written out on paper so that he can show his employer. UC-3 continued, "that way it covers the dirty drug test." Siao replied "gotcha" and wrote UC-3 a prescription for 5 mg strength Marinol.

**Count 4: Distribution of Oxycodone to UC-4 on May 16, 2018**

29. UC-4's first appointment with Siao took place on May 16, 2018. During the appointment UC-4 told Siao that he had played football for 14 years and has sporadic pain in the area of his shoulder, elbow, and arm. UC-4 said that he had recently moved from Southern California where he had been seeing a doctor that "hook[ed] him up with Oxys," but that since his arrival in San Jose, UC-4 had been borrowing pills from various people.

30. Siao asked UC-4 a series of medical history questions. He also asked if UC-4 had ever received MRI's or X-ray's or had any medical records he could provide. Siao also told UC-4 that there is "incredible scrutiny now on doctors and patients" and apologized for "interrogat[ing]" UC-4. Siao said that UC-4 would have to sign a pain contract and potentially take a drug screen test. After these warnings, Siao wrote UC-4 a prescription for 60 tablets of 30 mg strength oxycodone.

31. UC-4's second visit was on June 18, 2018. UC-4 met with Siao's Physician Assistant who reviewed UC-4's medical history. When Siao entered the exam room, Siao said he would like to keep UC-4's dosage at the same level and suggested decreasing it if possible. Siao then asked where UC-4 felt pain. When UC-4 hesitated to answer, Siao asked if it was UC-4's right shoulder. UC-4 responded, "yeah, with the help of the pills, I'm feeling good." Siao tried to clarify if the pain was UC-4's right shoulder and UC-4 responded, "sure, yeah" and then chuckled. To which Siao responded, "here and there right?" Siao then told UC-4 to be careful with the medication and refilled UC-4's prescription for 60 tablets of 30 mg strength oxycodone. UC-4's entire interaction with Siao lasted approximately two minutes and 15 seconds.

32. During UC-4's third appointment on July 16, 2018, he told Siao that he had to share some of last month's prescription with a co-worker and asked to get an increased dosage this month to compensate for the lost pills. Siao agreed to write a prescription for 70 tablets, instead of 60, and said that he would have to write in the prescription that the medication was to be taken three times daily, but verbally directed UC-4 not to take it three times per day. Siao said that he "had to change [the prescription] to three times a day in order to justify increasing it." Siao then said he would actually raise the prescription to 75 tablets if it was okay with UC-4. UC-4's entire interaction with Siao lasted approximately two minutes.

33. Siao did not physically examine UC-4 during any of these visits.

**Counts 5 and 6: Health Care Fraud**

34. E.H. was a patient of Siao's from approximately 2014 to at least 2019. E.H. was a Medi-Cal beneficiary whose pharmacy claims were paid by Santa Clara Family Health Plan (SCFHP), a managed care organization with whom Medi-Cal contracts to provide health insurance to beneficiaries.

35. From 2015 to 2018, multiple aberrant urine drug test results were returned for E.H. that showed positive results for illicit drugs and negative results for medications prescribed by Siao. This indicates that the patient was often not using the drugs Siao prescribed for him/her, and that there was no medical necessity for those prescriptions. In addition, Siao's morphine milligram equivalent (MME) prescribing to E.H. was over 300 mg/day from 2016 to 2019.

36. E.H. had a medical appointment with Siao on April 11, 2018. A urine test collected that day was labelled final with a release date of April 18, 2018. The listed (expected) medications for E.H. were identified as alprazolam, Contin (morphine) and oxycodone. No alprazolam was detected in E.H's results. Positive levels of amphetamines, cocaine metabolites, fentanyl, and methamphetamine were identified in the results.

37. E.H.'s next appointment with Siao was on May 9, 2018. Siao's progress notes for E.H.'s next visit on May 9, 2018, do not reflect E.H. revealing any illicit drug use. Siao documented that he counseled E.H. on the importance of compliance with her Controlled Substance Contract, however no notes were made specifically regarding any counseling or discussion of the urine test results. Siao provided E.H. with regular refill prescriptions for alprazolam (Xanax), oxycodone and morphine (MS Contin).

38. A historical CURES report for Siao showed fills by E.H. on May 9, 2018, at a pharmacy in Los Altos, California, for 180 tabs of 30 mg strength oxycodone under prescription #2512643 and 45 tabs of 1 mg strength alprazolam under prescription #4412319.

39. Santa Clara Family Health Plan was billed, and subsequently paid, for the two pharmacy claims as follows:

    a) **Count 5**: $9.92 was paid for prescription #2512643 (oxycodone) under claim ID 6079250950; and

      b)      **Count 6**: $0.25 was paid for prescription #4412319 (alprazolam) under claim ID 6079188290.

These prescriptions were not for a legitimate medical purpose, and Siao was not writing them in the usual course of professional practice.

## CONCLUSION

40.    Based on the foregoing, I hereby assert that probable cause exists to believe that **Donald Siao** violated 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Counts 1, 2, 3, and 4), and 18 U.S.C. § 1347 (Counts 5 and 6).

/s/ Brown/SvK w/ permission
DAVID W. BROWN
Task Force Agent
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this _4th_ day of March 2021.

THE HONORABLE SUSAN VAN KEULEN
United States Magistrate Judge

7