ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

AMANI S. FLOYD (CABN 301506)
DAN M. KARMEL (NYBN 5151485)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5596
FAX: (408) 535-5066
Amani.Floyd@usdoj.gov
Dan.Karmel@usdoj.gov

Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 21-00267 BLF |
| Plaintiff, | **UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR A NEW TRIAL** |
| v. | |
| DONALD SIAO, | |
| Defendant. | |

1

2

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ..........................................................................................................1

**BACKGROUND** ............................................................................................................1

I.     Overview of the Investigation into Dr. Siao ....................................................1

       A.    Undercover Agent Lottie Bloxsom a/k/a "Lacy Blackwell" ................2

       B.    Undercover Agent Ross Martin a/k/a "Allen McKay" .......................3

       C.    Undercover Agent Eric Maher a/k/a "Eric Thrasher" ........................5

       D.    Undercover Agent Brian McGlinchey a/k/a "Doug Kiernan" ............6

       E.    E.J. ......................................................................................................7

       F.    A.J. .....................................................................................................8

II.    Dr. Charles Szabo's Trial Testimony .............................................................9

III.   Dr. Siao's Prior Recorded Statements ..........................................................12

IV.   Dr. Siao's Trial Testimony ...........................................................................13

V.    The Guilty Verdict and New Trial Motion ...................................................14

**ARGUMENT** ...............................................................................................................15

I.     Standard of Review .......................................................................................15

II.    The Jury Instructions Were Proper ...............................................................16

       A.    Dr. Siao's Reading of Instruction No. 46 is Grammatically Incorrect ...............................16

       B.    Instruction No. 46 is Consistent with the Ninth Circuit Model Jury Instructions ..........................17

III.   Any Error With the Jury Instructions Was Harmless In Light of All the Circumstances of Trial ................................................................................18

       A.    The Government Presented Overwhelming Evidence that Dr. Siao Wrote the Charged Prescriptions in an Unauthorized Manner ................18

       B.    The Parties' Closing Arguments and Rebuttal Made Clear to the Jury That It Was Required to Determine Whether Dr. Siao Acted in an Unauthorized Manner ................................23

       C.    Neither the Jury Questions nor Time of Deliberation Suggest Error ...............24

**CONCLUSION** ............................................................................................................25

# TABLE OF AUTHORITIES

**Federal Cases**

*Flores-Figueroa v. United States*, 556 U.S. 646 (2009) ............................................................ 16

*Ruan v. United States*, 142 S. Ct. 2370 (2022) ......................................................................... 17

*United States v. Chang*, No. 16-CR-00047-EJD-1, 2020 WL 5702131 (N.D. Cal. Sept. 24, 2020) ....... 15

*United States v. Del Toro–Barboza*, 673 F.3d 1136 (9th Cir. 2012) ......................................... 15

*United States v. Fuchs*, 218 F.3d 957 (9th Cir. 2000) ............................................................... 15

*United States v. Garrido*, 713 F.3d 985 (9th Cir. 2013) ........................................................... 15

*United States v. Kramer*, No. 16-CR-00322-EJD-1, 2020 WL 5408165 (N.D. Cal. Sept. 9, 2020) ....... 15

*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) ............................................................. 15

*United States v. Nubla*, No. 21-CR-00139-RS, 2023 WL 5181636 (N.D. Cal. Aug. 11, 2023) ............. 15

*United States v. Ramirez-Ramirez*, 45 F.4th 1103 (9th Cir. 2022) ........................................... 15

*United States v. Shields*, 844 F.3d 819 (9th Cir. 2016) ............................................................ 15

**Statutes**

21 U.S.C. § 841 ........................................................................................................................... 14

**Rules**

Fed. R. Crim. P. 33 ........................................................................................................ 1, 14, 15

Fed. R. Crim. P. 52 ................................................................................................................... 15

1

## INTRODUCTION

2      The United States herein files its opposition to defendant Dr. Donald Siao's August 11, 2023,

3  motion for a new trial under Fed. R. Crim. P. 33.  ECF No. 108.  Dr. Siao claims that he is entitled to a

4  new trial because the third element of Instruction No. 46 Re: Unauthorized Distribution of a Controlled

5  Substance ("Instruction No. 46") purportedly did not include both objective and subjective requirements,

6  meaning it allowed the jury to convict Dr. Siao for subjectively intending to act in an unauthorized manner

7  without finding that he did in fact act in an unauthorized manner.

8      This argument is premised upon a misreading of the plain language of the jury instruction.  The

9  third element of Instruction No. 46 required the jury to find that Dr. Siao "knowingly or intentionally acted

10  in an unauthorized manner"—in other words, that Dr. Siao acted in an unauthorized manner, and that he

11  did so knowingly or intentionally.  Dr. Siao's argument that the jury instruction "merely [told] the jury

12  how to determine whether Dr. Siao intended to act in an unauthorized manner," *see* Def. Mot. at 7, is

13  simply incorrect.  It is also at odds with the numerous Ninth Circuit model jury instructions that adopt this

14  construction and set forth objective and subjective requirements in a single element, including the first

15  element of Instruction No. 46—to which Dr. Siao tellingly does not object.

16      The government submits that there was no error in the jury instruction, much less the plain error

17  Dr. Siao is required to show.  Moreover, even assuming there was an error, Dr. Siao cannot show that the

18  error affected his substantial rights at trial.  Both parties stated in closing argument that the government

19  was required to prove Dr. Siao acted in an unauthorized manner.  And the evidence presented at trial

20  overwhelmingly established that he did.  Dr. Siao's claim is therefore meritless.

21

## BACKGROUND

22  **I.      Overview of the Investigation into Dr. Siao**

23      As the Court no doubt recalls, this case involved the prosecution of Dr. Donald Siao, a family

24  medicine doctor, who illegally prescribed powerful opiates outside of the usual course of his professional

25  practice and without a legitimate medical purpose.  The investigation into Dr. Siao began in early 2017,

26  when a suspicious prescription written by Dr. Siao was identified in connection with a separate

27  investigation.  The California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse

28

(BMFEA) thereafter reviewed Dr. Siao's CURES[1] data, which showed that from May 2016 to May 2017 he wrote 8,201 prescriptions for controlled substance medications. These included large quantities of 30 mg Oxycodone, and multiple instances of combinations of an opioid, muscle relaxant, and benzodiazepine (colloquially known as the "Holy Trinity"), which public health authorities have warned is particularly dangerous because that combination of medications significantly depresses the central nervous system and a person's ability to breath.

Between September 2017 and September 2018, BMFEA sent four undercover law enforcement agents (the "UCs") to Dr. Siao's medical office under the guise of being patients seeking opioids. All of the UC visits to Dr. Siao were audio and/or video recorded. During the visits, Dr. Siao prescribed Schedule II controlled substances to the UCs based on vague and inconsistent complaints of pain, with little to no medical examination, and despite significant red flags intentionally raised by the UCs. Prescriptions written to the UCs were the basis for Counts One through Four of the Superseding Indictment.

The Superseding Indictment also charged eight counts regarding two former actual patients of Dr. Siao, identified as E.J. (Counts Five through Eight) and A.J. (Counts Nine through Twelve). Information regarding Dr. Siao's treatment of E.J. and A.J. was derived from their patient files. Among other things, E.J.'s and A.J.'s patient files showed that Dr. Siao prescribed them Hydrocodone and Oxycodone without any evidence of underlying pathology and despite multiple serious red flags, including E.J.'s fatal overdose in February 2019 and A.J.'s overdose in September 2019 that resulted in his hospitalization.

## A.    Undercover Agent Lottie Bloxsom a/k/a "Lacy Blackwell"

Agent Lottie Bloxsom visited Dr. Siao on five occasions using the alias "Lacy Blackwell." During her first appointment on September 19, 2017, she told Dr. Siao that as a hairdresser she spent a lot of time on her feet and it was "a lot of stress on the body, or whatever," and was hoping to get a prescription for Norco, which is a brand name for Hydrocodone with Acetaminophen. *See* Trial Exh. 1B. Dr. Siao asked

---

[1] CURES (the Controlled Substance Utilization Review and Evaluation System) is a platform maintained by the California Department of Justice that tracks Schedule II – V controlled substances dispensed to patients in California.

Agent Bloxsom a series of questions about her medical history, including her history of using Norco.  He then asked where she had pain specifically, and suggested her ankles or lower back.  Agent Bloxsom gave vague answers, explaining, "sometimes, if it all, maybe in my knee, or whatever," but then said, "it's one of those things where like, it's not like I have pain there, you know."  Dr. Siao explained to her that he had to "justify these things" due to increased regulatory scrutiny related to opioids.  At the end of her first visit, Dr. Siao gave her a prescription for 45 tablets of 10 mg Norco.  Over the next three appointments, Dr. Siao regularly warned her to be careful and not to take too many pills despite consistently increasing the number of Norco tablets that he prescribed during each visit.

During her fourth visit, on January 22, 2019, Agent Bloxsom told Dr. Siao that she wanted additional pills so that she could give them to another person, explaining: "I ran out of a few and . . . had to borrow a couple.  So I want to give that person their pills back . . . ."  *See* Trial Exh. 65A.  Dr. Siao responded, "Okay.  I'm just going to say that you're having more pain in the knee; is that right?  And that you're requiring more.  Okay?"

On her fifth and final visit on February 26, 2018 (Count One), Agent Bloxsom asked Dr. Siao for a prescription for Xanax, which is a brand name for Alprazolam.  *See* Trial Exh. 10B.  Dr. Siao offered her 30 tablets of 0.5 mg strength Xanax.  She responded that she was used to the 1 mg strength that she had previously received from a friend and asked for the higher strength.  Dr. Siao then wrote a 1 mg Xanax prescription in addition to a prescription for 90 tablets of 10 mg Norco.  *See* Trial Exh. 11.

Over the course of the five visits, Dr. Siao doubled Agent Bloxsom's prescription of 10 mg Norco from 45 tablets to 90 tablets.  Dr. Siao did not conduct any physical examination of Agent Bloxsom during any of her visits, nor did he obtain her prior medical records.  Dr. Siao's patient file for Agent Bloxsom indicates that she was being treated for "Pain in unspecified knee."  *See* Trial Exh. 130-005.  It did not contain a diagnosis of the cause of Agent Bloxsom's knee pain or identify which knee was experiencing pain.

**B.    Undercover Agent Ross Martin a/k/a "Allen McKay"**

Agent Ross Martin visited Dr. Siao four times using the alias "Allen McKay."  His first appointment with Dr. Siao was on January 22, 2018.  *See* Trial Exhs. 67A, 68A.  During that first appointment, Agent Martin told Dr. Siao that he worked as a landscaper and that his elbow had a "funny

1  feeling." Dr. Siao asked Agent Martin a series of questions about medication and family medical history.

2  After briefly palpating Agent Martin's elbow, Dr. Siao concluded that Agent Martin had tennis elbow or

3  golfer's elbow.   Dr. Siao did not perform any medical examination during any of Agent Martin's

4  subsequent three appointments.  Dr. Siao told Agent Martin that he preferred to start patients on non-

5  opioid medications.  Agent Martin responded that he had tried those, but had received Norco from his

6  friends and found them effective.  In response, Dr. Siao told Agent Martin about the addictive properties

7  of opioids, but wrote him a prescription for 30 tablets of 10 mg strength Norco.

8       Agent Martin's second appointment with Dr. Siao was on April 10, 2018.  *See* Trial Exhs. 16A,

9  16B.  At one point during the appointment, Dr. Siao asked Agent Martin if he had ever had any X-rays

10  done on his elbow.  When Agent Martin said that he had not, Dr. Siao responded, "Okay . . . let's not get

11  too far into it.  We'll just give you the Norco."  He then wrote another prescription for 30 tablets of 10 mg

12  strength Norco.

13       Agent Martin's third appointment with Dr. Siao took place on May 17, 2018.  *See* Trial Exhs. 84A,

14  85A.  Agent Martin asked to increase his prescription to 70 tablets because he had given some of his pills

15  to employees as an incentive to show up for work: "I got, uh, a couple guys on my crew – one is like a

16  300-pound dude . . . he encompasses the whole lawn mower.  And . . . sometimes you gotta feed him half

17  a pill just to get him to show up."  Dr. Siao responded by saying, "God, I'm sorry. . . .  So 75 – is that what

18  you're saying, 75 pills?"  Agent Martin stated that 70 was sufficient and Dr. Siao agreed.  Dr. Siao then

19  wrote the prescription for 70 tablets of 10 mg strength Norco.

20       Agent Martin's fourth and final appointment with Dr. Siao was on June 18, 2018 (Count Two).

21  *See* Trial Exh. 20B.   Agent Martin's interaction with Dr. Siao during this appointment lasted

22  approximately 2 minutes and ten seconds.   During the appointment, Agent Martin requested his

23  prescription be increased to 90 tablets because he had run out during a concert that he attended out of state

24  and had to visit a local clinic for refills.  Dr. Siao said that he could not prescribe more than 100 tablets

25  because the "DEA is really cracking down on doctors not prescribing too much."  Dr. Siao then wrote

26  Agent Martin a prescription for 90 tablets of 10 mg strength Norco.  *See* Trial Exh. 21.

27       Over the course of the four visits, Dr. Siao tripled Agent Martin's prescription of 10 mg Norco

28  from 30 tablets to 90 tablets.  Aside from the first visit, Dr. Siao did not conduct any physical examination

1   of Agent Martin, and he never obtained his prior medical records.  Dr. Siao's patient file for Agent Martin

2   indicates that he was being treated for "Pain in right wrist."  It did not contain a diagnosis of the cause of

3   the wrist pain, nor explain why the initial documented complaint of "Right elbow pain" was changed to

4   "Pain in right wrist."  *Compare* Trial Exh. 132-027 *with* Trial Exh. 132-021, 132-014, 132-006.

5   **C.     Undercover Agent Eric Maher a/k/a "Eric Thrasher"**

6            Agent Eric Maher visited Dr. Siao four times using the alias "Eric Thrasher."  Agent Maher's first

7   appointment with Dr. Siao was on February 26, 2018.  *See* Trial Exh. 23B.  During the appointment, Agent

8   Maher told Dr. Siao that he wanted to get established as a patient and get a prescription for 10 mg strength

9   Norco.  He explained that he worked in construction and was on his feet "all day standing around," so his

10  legs would "get tired and stiff."  Dr. Siao attempted several times to elicit a statement regarding pain from

11  Agent Maher, which Agent Maher did not provide:

12          Dr. Siao:             Okay. So it's chronic pain that you have secondary
13                                to the work that you do?

14          Officer Maher:        Yeah, I wouldn't say pain, but definitely. . . I feel it
                                  at the end of the day.
15
16          Dr. Siao:             Okay. So it's just diffuse pain that you have, right?

17          Officer Maher:        I don't know. . . . I just feel like my legs are tired and
                                  stiffness.
18
19          Dr. Siao:             Okay. . . . I'm going to put chronic pain . . . .

20          Officer Maher:        Yeah . . . whatever you need to say is good for me.

21          Dr. Siao then discussed the "quote unquote opioid crisis" with Agent Maher and said that the DEA

22  was aggressively regulating prescribers and pharmacies.  Dr. Siao said that he needed Agent Maher to

23  sign a pain contract and undergo urine drug screening, and that the DEA monitors which pharmacies fill

24  prescriptions.  Dr. Siao stated it was "kind of like big brother watching."  After asking a series of general

25  medical history questions, Dr. Siao had a medical assistant administer an electrocardiogram on Agent

26  Maher.  Dr. Siao then briefly monitored Agent Maher's heart and lungs with a stethoscope and palpated

27  his legs.  After the brief physical exam, Dr. Siao said that he would write a prescription for 45 tablets and

28  asked if that would be okay with Agent Maher.  Agent Maher concurred.  Dr. Siao also said that he would

1   give Agent Maher a lab slip for a blood test.   Agent Maher explained that he would rather come to Dr.

2   Siao for Norco instead of getting it from colleagues at work.   In response, Dr. Siao inquired how much

3   Agent Maher had been paying and Agent Maher answered ten dollars a pill.   Dr. Siao then stated, "That

4   is nuts. . . .   Well, I'm not going to say anything. . . .   Some people try and make a business out of that.

5   Put it that way."   Dr. Siao then wrote Agent Maher a prescription for 45 tablets of 10 mg strength Norco.

6          Agent Maher's second appointment with Dr. Siao was on April 10, 2018 (Count Three).   *See* Trial

7   Exhs. 25A, 25B.   During the appointment, Agent Maher said that he had run out of Norco and had to

8   borrow from others since his last appointment.   Agent Maher asked Dr. Siao to increase his dosage to 60

9   tablets in order to pay back the person from whom he had borrowed.   Dr. Siao wrote Agent Maher a

10  prescription for 60 tablets of 10 mg strength Norco.   *See* Trial Exh. 26.

11         Over the course of the four visits, Dr. Siao increased Agent Maher's prescription of 10 mg Norco

12  from 45 tablets to 75 tablets.   Aside from the first visit, he did not conduct any physical examination of

13  Agent Maher, and he never obtained his prior medical records.   Dr. Siao's patient file for Agent Maher

14  indicates that he was being treated for "Chronic pain disorder."   It did not contain a diagnosis or specify

15  the location of Agent Maher's pain.   *See* Trial Exh. 133-019.

16  **D.     Undercover Agent Brian McGlinchey a/k/a "Doug Kiernan"**

17         Agent Brian McGlinchey visited Dr. Siao four times using the alias "Doug Kiernan."   His first

18  appointment with Dr. Siao took place on May 16, 2018.   *See* Trial Exhs. 69A, 69B.   During the

19  appointment, Agent McGlinchey told Dr. Siao that he had played football for fourteen years and had

20  sporadic pain in the general area of his upper right torso.   Agent McGlinchey said that he had recently

21  moved from Southern California where he had been seeing a doctor that "hook[ed] him up with Oxys,"

22  but that since his arrival in San Jose, Agent McGlinchey had been borrowing pills from various people.

23  Dr. Siao asked Agent McGlinchey a series of medical history questions.   He also asked if Agent

24  McGlinchey had ever received MRIs or X-rays or had any medical records he could provide.   Dr. Siao

25  told Agent McGlinchey that there was an "incredible amount of scrutiny now on doctors and patients"

26  and apologized for "interrogat[ing]" Agent McGlinchey.   Dr. Siao then said that Agent McGlinchey would

27  have to sign a pain contract and potentially take a drug screen test.   After these warnings, Dr. Siao wrote

28  Agent McGlinchey a prescription for 60 tablets of 30 mg strength Oxycodone.

Agent McGlinchey's second visit was on June 18, 2018.  *See* Trial Exhs. 34A, 34B.  Agent McGlinchey met with Dr. Siao's Physician Assistant, who reviewed Agent McGlinchey's medical history. When Dr. Siao entered the exam room, Dr. Siao said that he would like to keep Agent McGlinchey's dosage at the same level and suggested decreasing it if possible.  Dr. Siao then asked where Agent McGlinchey felt pain.  When Agent McGlinchey hesitated to answer, Dr. Siao asked if it was Agent McGlinchey's right shoulder.  Agent McGlinchey responded, "yeah, with the help of the pills, I'm feeling good." Dr. Siao tried to clarify if the pain was Agent McGlinchey's right shoulder and Agent McGlinchey responded, "sure, yeah" and then chuckled, to which Dr. Siao responded, "here and there right?"  Dr. Siao then told Agent McGlinchey to be careful with the medication and refilled Agent McGlinchey's prescription for 60 tablets of 30 mg strength Oxycodone.  Agent McGlinchey's entire interaction with Dr. Siao lasted approximately two minutes and 15 seconds.

During Agent McGlinchey's third appointment on July 16, 2018 (Count Four), Agent McGlinchey told Dr. Siao that he had to share some of his previous month's prescription with a co-worker and asked to get an increased dosage.  *See* Trial Exhs. 36A, 36B.  Dr. Siao agreed to write a prescription for 70 tablets, instead of 60, and said that he would have to write in the prescription that the medication was to be taken three times daily, but verbally directed Agent McGlinchey not to take it three times per day. Dr. Siao said that he "had to change [the prescription] to three times a day in order to justify increasing it." Dr. Siao then said he would actually increase the prescription to 75 tablets if it was okay with Agent McGlinchey.  He then wrote Agent McGlinchey a prescription for 75 tablets of 30 mg strength Oxycodone. *See* Trial Exh. 37.  Agent McGlinchey's entire interaction with Dr. Siao lasted approximately two minutes.

Over the course of the four visits, Dr. Siao increased Agent McGlinchey's prescription of 30 mg Oxycodone from 60 tablets to 75 tablets.  Dr. Siao did not conduct any physical examination of Agent McGlinchey during any of his visits, nor did he obtain his prior medical records.  Dr. Siao's patient file for Agent McGlinchey indicates that he was being treated for "Chronic pain disorder."  It did not contain a diagnosis or specify the location of Agent McGlinchey's pain.  Trial Exh. 131-020.

**E.    E.J.**

E.J. first visited Dr. Siao on April 9, 2018, and her patient file indicates that she was being treated

1  by Dr. Siao for rheumatoid arthritis and unspecified anxiety disorder.  *See* Trial Exh. 53.  Throughout the

2  course of her treatment, which lasted until February 13, 2019, Dr. Siao wrote E.J. multiple prescriptions

3  for Oxycodone and Alprazolam.  E.J.'s patient file contained no evidence of laboratory findings consistent

4  with rheumatoid arthritis or any description of the pain in terms of location, intensity, quality, or response

5  to medications.

6       Additionally, E.J. presented significant red flags, beginning almost immediately with the fact that

7  she claimed to be going to Dr. Siao because her primary care physician had retired, but there was no

8  indication that Dr. Siao identified who that physician was or obtained E.J.'s prior medical records.  E.J.

9  also repeatedly requested early refills because of supposedly lost or stolen medications, including on

10 August 15, 2018, when she claimed that her medication was stolen by her son, A.J., whom she specifically

11 noted was also a patient of Dr. Siao's ("A problem has occurred [A.J.] my son who sees u guys as a patient

12 has stolen my meds.").  According to E.J.'s patient file, on October 29, 2018, E.J.'s mother called to say

13 that E.J. was in jail for selling pills and "was not doing well" and was taken to the ER.  On November 6,

14 2018, Dr. Siao again prescribed E.J. Oxycodone, although her records state: "Had extensive discussion on

15 CONTRACT and that any further problems will not be tolerated!!"

16      E.J. was found deceased on February 27, 2019, two weeks after her last visit to Dr. Siao.

17 According to the Report of Autopsy, her cause of death was "Mixed drug toxicity (alprazolam and

18 oxycodone)" and her manner of death was determined to be an accident.  Dr. Siao prescribed E.J.

19 Alprazolam and Oxycodone on multiple occasions, including during her last visit to his office on

20 February 13, 2019.  An entry in E.J.'s patient file dated June 10, 2019, indicates that Dr. Siao's office was

21 informed that she had died of an overdose, caused by a mixture of Xanax and Oxycodone.

22 **F.     A.J.**

23      A.J. first visited Dr. Siao on May 24, 2018, at which time Dr. Siao wrote that A.J. had chronic pain

24 disorder and unspecified Dorsalgia, which is a general term for back pain.  *See* Trial Exh. 46.  Throughout

25 the course of his treatment, which lasted until December 3, 2019, Dr. Siao wrote A.J. multiple

26 prescriptions for controlled substances, including the opioids Hydrocodone and Oxycodone.  Dr. Siao

27 never identified the cause of A.J.'s pain, and over the entire course of treatment there was no description

28 of the pain in terms of location, intensity, quality, or response to medications.

1    A.J., too, presented significant red flags.  For example, there were indications of diversion or abuse

2    and an inconsistent drug test showing the absence of Hydrocodone and the presence of Methamphetamine.

3    A.J.'s patient file also included diagnoses of drug seeking behavior, opioid dependence, and moderate use

4    disorder, as well as a drug overdose on September 13, 2019, where A.J. was found unresponsive in a

5    Denny's.  Dr. Siao's patient file for A.J. indicates that A.J. had admitted to "taking all of his medication

6    together, including . . . Soma and Oxycodone."

7    **II.      Dr. Charles Szabo's Trial Testimony**

8         At trial, Dr. Charles Szabo testified for the government as an expert witness on the subject of the

9    standard of care in pain management.  Tr. 6/14/23 at 90:20–91:2.  As part of this testimony, he provided

10   the jury with background on the nature of pain and pain management, and laid out the fundamental criteria

11   that define the proper standard of care.  In particular, Dr. Szabo emphasized three core pillars:

12              [First,] when you're seeing a patient, you need to make a diagnosis of what
                is going on so you know what to treat and how to treat it.
13

14              Number two, you need to start a treatment program and follow up regularly
                . . . to make sure what you're doing is working.
15

16              And the third thing is do no harm.  You have to make sure that whatever
                treatment you're doing, you're not hurting the patient.
17
                So that's what you need to remember: diagnosis, follow up in treatment,
18              and do no harm.

19   *Id.* at 92:14–93:1*; see also id.* at 110:2–110:15.  According to Dr. Szabo, those are "the three things that

20   . . . are most important in seeing patients."  *Id.* at 109:25–110:1.

21        Dr. Szabo thereafter explained what must be included in the process of diagnosing a patient,

22   including identifying where the pain is, *id.* at 94:24–94:25, 96:10, describing how the patient is

23   experiencing the pain (e.g., "Is it radiating?"), *id.* at 94:25–95:1, 96:10–96:12, quantifying the severity of

24   the pain, *id.* at 95:12–95:14, 96:10, and determining its duration, *id.* at 95:1–95:3.  Critically, the process

25   of diagnosing requires attempting to determine the cause and origin of the pain: "When you see a patient

26   with pain, you need to diagnose where it is causing the pain and where it's coming from.  It's not always

27   easy, but it's something that needs to be thought of and approached every time you see a patient, you need

28   to try to verify."  *Id.* at 96:18–96:22.  Dr. Szabo also explained the need to begin treatment with non-

1   opioid alternatives: "You go from least invasive to most invasive.  So heat and ice, simple."  *Id.* at 97:8–

2   97:9.  "We use the non-opioid medications first because the opioids, as we know, can be addictive and

3   have a lot of problems."  *Id.* at 98:6–98:8.  And he explained that to abide by the basic standard of care,

4   "you need to obtain a medical history" for the patient, "you have to do a physical examination each time

5   the patient comes in," and "you have to have accurate records, it's absolute."  *Id.* at 100:23–101:9.

6        Dr. Szabo also testified about the dangers and red flags associated with prescribing opioids.

7   "When you see patients, there are certain things that you look for that are what we call red flags. . . .  So

8   for instance, use of street drugs.  That's not a person who you want to give opioids to if they're already

9   abusing illicit substances."  *Id.* at 102:15–102:24.  Other red flags Dr. Szabo identified were a past history

10  of substance abuse, *id.* at 103:4, patients requesting specific medications by name, *id.* at 103:7–103:11,

11  patients going to multiple pharmacies, *id.* at 103:12, lost prescriptions, *id.* at 103:17–103:19, young people

12  complaining of chronic pain, *id.* at 103:20–103:21, dosages of more than 50 morphine milligram

13  equivalents (MMEs) per day, *id.* at 103:23–104:2, and the use of opioids in combination with

14  benzodiazepines, which Dr. Szabo explained "increase[s] the risk of overdose by four fold alone," *id.* at

15  104:4–104:8.

16       Dr. Szabo then proceeded to assess Dr. Siao's treatment of the UCs, E.J., and A.J. and explained

17  why none of the charged prescriptions were within the usual course of professional practice or with a

18  legitimate medical purpose.  With respect to the UCs, Dr. Szabo noted:

19              So the physical exam in these cases, there was none.  There was no approach
                to the patient, a couple of the patients did complain of a body part pain, they
20              were not examined.  The other patients, you don't even know where their
                pain was and so it would be very difficult to think that giving opioids in this
21              case was appropriate.

22  *Id.* at 140:12–140:17.  On the question of whether it was appropriate to prescribe pills to a patient who

23  indicated they were planning to share them with others, Dr. Szabo responded, "The answer is 100 percent

24  no in any circumstance."  *Id.* at 207:4–207:8.

25       Dr. Szabo further testified that the UC recordings only "amplified" the findings that he had derived

26  from reviewing the UCs' patient files:

27              They, again, amplified my feelings about whether these were appropriate.
                Just standing on the record alone, they were all inappropriate for various
28              reasons that we discussed, and the videos really showed that the doctor was

UNITED STATES' OPP. TO DEF.'S MOT. FOR NEW TRIAL
CR 21-00267 BLF                              10

> in the room for typically two minutes or so.  There was no physical exam.
> A lot of the discussion that showed up in the reports, I didn't see them on
> those videos.  The physical exams were never done as far as I could tell on
> any of the videos, and so anything that indicated there was a physical exam
> was put in the medical records without it being done.
>
> So the videos certainly amplified what I believed were inappropriate
> treatments on all of those patients.

*Id.* at 139:13–139:24.

Regarding E.J., Dr. Szabo testified: "Looking through [E.J.'s patient file], multiple times, I was not able to find anything that indicated [she] had rheumatoid arthritis, whether a mild or severe case." *Id.* at 143:2–143:4.  He also noted that "there were no physical exams that indicated joint disease," "I could find nothing in the chart that indicated that the patient had any of these abnormalities," "there were no X-rays . . . [or] outside records," and that he did not see any indication that E.J. had received rheumatoid arthritis medication.  *Id.* at 143:2–143:19.  "So basically the establishment of rheumatoid arthritis as a cause for providing opioids was not present as far as I could tell."  *Id.* at 143:20–143:22.  Dr. Szabo also noted that E.J.'s patient file showed a number of red flags.  *See, e.g.*, *id.* at 150:9–150:12 ("There have been multiple requests for early refills, lost medications, stolen medications, confiscations from the TSA.  It looks like we're heading into a difficult situation with her.").  Ultimately, Dr. Szabo concluded that the prescriptions to E.J. were without a legitimate medical purpose and outside the usual course of professional practice.  *Id.* at 156:23–157:6.

Dr. Szabo provided similar testimony regarding A.J., noting that "similar to the other case, there seemed to be no documentation of a clear painful diagnosis that required treatment with controlled substances," and there were "multiple red flags in terms of the patient's behavior."  *Id.* at 157:14–157:20.  Referring to A.J.'s patient file, Dr. Szabo further explained:

> The treatment is for Dorsalgia, unspecified.  And Dorsalgia is a general
> term, the dorsal is the back half of the person, or it could be anything.  And
> algia is pain.  And it's a very nonspecific indication of pain in the back of
> his body.  It doesn't specify what is hurting or where there might be any
> tissue changes or damage.

*Id.* at 158:21–159:1.

Dr. Szabo continued:

> There is no indication the patient is having any pain.  There is no description

> of pain, there's no indication what hurts, there's no indication how badly it hurts if it does hurt.  We don't know what the past treatment was.  We don't know what the workup was.
>
> The physical exam, which there was this time a musculoskeletal, doesn't show anything.  The neurological exam was normal.  So there's no indication either from past history, present history, or physical exam that the patient has any painful process at the time.

*Id.* at 159:7–159:16.

At the end of his direct testimony, Dr. Szabo provided the following summary of Dr. Siao's treatment of A.J.:

> In treating patients with pain or back pain or any type of pain, you need to go through the progression like you showed before when we had our little slide show.
>
> The use of Norco in a patient with really no documented injury, damage, or anything otherwise is not appropriate.  We didn't see an MRI scan that showed anything.  There needed to be a specified diagnosis of a painful condition.  Just saying that the patient has Dorsalgia is not specific enough to indicate what your diagnosis is.
>
> When we talk about pathology, which is damaged or injured tissue, that's what we would look for in this patient to see if there was a reason for his back pain.  The fact that we saw nothing throughout the whole course of treatment, and plus the fact that there were no pain levels noted and no indication that Norco was changing pain levels and there was no physical exam that indicated that the patient's range of motion or anything was getting better, the use of Norco in this situation, again, is outside of the usual course of professional practice and was without a legitimate medical purpose.

*Id.* at 174:4–174:23.

## III.   Dr. Siao's Prior Recorded Statements

The government's last witness at trial was Special Agent Supervisor Charles Vela, from the California Department of Justice Division of Medical Fraud and Elder Abuse.  Among other things, Agent Vela testified that in November 2018 he and another officer interviewed Dr. Siao at the time law enforcement searched Dr. Siao's medical office.  During the interview, Dr. Siao made several concessions regarding his awareness of the proper standard of care.  In particular, Agent Vela testified, and the government admitted audio recordings demonstrating that Dr. Siao:

- Acknowledged he was familiar with and tried to adhere to the Medical Board of California Guidelines for Prescribing Controlled Substances for Pain. *See* Tr. 6/16/23 at 13:4–14:9; *see also* Trial Exhs. 60A and 98.

- Claimed to conduct exams of patients every time he saw them. *See* Tr. 6/16/23 at 14:10–19; *see also* Trial Exhs. 60B and 60C.

- Claimed that if he became aware of a patient selling pills he would no longer work with that patient, and that prescribing pills to patients who said they would share the pills was a "no no." *See* Tr. 6/16/23 at 15:21–17:6; *see also* Trial Ex. 60E.

Agent Vela also read the following from the Medical Board Guidelines that Dr. Siao claimed to know and abide by: "For every patient, the initial work-up should include a systems review and relevant physical examination, as well as laboratory investigations as indicated." Tr. 6/16/23 at 33:14–33:17; *see also* Trial Exh. 98-054.

## IV.   Dr. Siao's Trial Testimony

Dr. Siao testified at trial in his own defense. In response to testimony and evidence presented in the government's case-in-chief, he testified, among other things:

- That while "a lot [had] been made of no exams," the "most important" way that physicians examine patients is visually, and he did not think "we should diminish our ability to gather important information through our visual examination." Tr. 6/16/23 at 79:16–79:23.

- That Agent Bloxsom had presented a history of chronic pain, *id.* at 80:13–80:16, and patients like her "don't have all the money to get X-rays or CT scans or MRIs, they certainly don't have the money for [him] to refer them to a rheumatologist or an orthopedic," *id.* at 80:21–80:23. He also claimed to be "trying to consider the patient in terms of her occupation [and] the fact that she didn't have insurance." *Id.* at 84:2–84:4.

- That for Agent McGlinchey, based on the chronic nature of his problem and the "non-injured situation," the "most expedient treatment would be prescribing him the pain medication which he had used in the past." *Id.* at 90:23–91:2.

- That his treatment of all six patients was appropriate and for a legitimate medical purpose. *See, e.g.*, *id.* at 93:15–93:21.

On cross-examination, Dr. Siao acknowledged that he had been taught how to treat patients, how to conduct a physical exam, about the dangers of addiction, and how to identify drug seeking patients. *Id.* at. 97:10–97:19. He also acknowledged that part of his job as a gatekeeper was to sometimes refuse to prescribe opioids to patients, even if they requested them and claimed to be in pain. *Id.* at 97:20–98:11.

Dr. Siao testified that he was familiar with his practice's Controlled Substance Policy/Agreement, which, among other things, warned of the "high potential for misuse and abuse" of controlled substances, such as narcotics. *See id.* at 98:12–99:8; Trial Exhs. 105, 116. He also acknowledged the importance of keeping accurate patient files and testified that he ensures that they reflect essential information, including diagnoses and medications. Tr. 6/16/23 at 100:8–100:17. He also testified that he always reviews a patient file before prescribing a patient opioids. *Id.* at 101:18–102:25. Additionally, he testified that the more he sees patients the more revenue his practice generates, whether on a visit-by-visit or month-by-month basis. Tr. 6/16/23 at 99:10–100:7.

In response to questions regarding his direct testimony, Dr. Siao acknowledged that although he relied on Agent Bloxsom's claim of a history of chronic pain, he never reviewed her prior medical records and he had no information regarding her history of chronic pain aside from her statements. *Id.* at 104:9–105:1. He also acknowledged that he never conducted a physical examination of Agent Bloxsom and that conducting a physical examination would not have cost her any additional money, and that requesting her medical records would not have cost her a "significant amount." *Id.* at 103:5–105:6. He also acknowledged that, notwithstanding his references to Agent Bloxsom's claimed occupation, he did not think all hairdressers should be given opioids. *Id.* at 105:11–105:20.

Dr. Siao also conceded that he never reviewed prior medical records for Agent Martin. *Id.* at 106:21–106:23. He also acknowledged that a doctor should optimize for the well-being of the patient, not the most expedient treatment. *Id.* at 107:5–107:13. Finally, Dr. Siao acknowledged that he was informed no later than June 2019 that E.J. had died of a drug overdose from a mixture of Xanax and Oxycodone and that he continued thereafter to prescribe opioids to A.J. *Id.* at 107:15–108:25.

## V.   The Guilty Verdict and New Trial Motion

Following trial, the jury convicted Dr. Siao of twelve counts of distributing a federally controlled substance without authorization, in violation of 21 U.S.C. § 841(a)(1). On August 11, 2023, Dr. Siao filed

the instant motion seeking a new trial pursuant to Federal Rule of Criminal Procedure 33.  For the reasons set forth herein, the government respectfully requests that the motion be denied in its entirety.

## ARGUMENT

### I.   Standard of Review

Under Federal Rule of Criminal Procedure 33, a "court may vacate any judgment and grant a new trial if the interest of justice so requires," Fed. R. Crim. P. 33(a), which may include failure to give proper jury instructions, *United States v. Kramer*, No. 16-CR-00322-EJD-1, 2020 WL 5408165, at *5 (N.D. Cal. Sept. 9, 2020).  Rule 33 motions, however, "are generally disfavored and should only be granted in 'exceptional' cases."  *United States v. Nubla*, No. 21-CR-00139-RS, 2023 WL 5181636, at *1 (N.D. Cal. Aug. 11, 2023) (quoting *United States v. Del Toro–Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012)).  "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted."  *Id.* (citations omitted).

Where, as here, a defendant did not object to a jury instruction or an omission from a jury instruction, a court reviews for plain error.  *Kramer*, 2020 WL 5408165, at *5 (citing *United States v. Fuchs*, 218 F.3d 957, 961 (9th Cir. 2000)); *see generally* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").  In order to satisfy this standard, the defendant must show "(1) there is error, (2) that is plain [i.e., clear and obvious], and (3) the error affects substantial rights [i.e., affects the outcome of the proceedings]."  *United States v. Ramirez-Ramirez*, 45 F.4th 1103, 1109 (9th Cir. 2022) (quoting *United States v. Shields*, 844 F.3d 819, 823 (9th Cir. 2016)) (alterations in original).

Even in a case where a defendant did object to a jury instruction at trial, for purposes of a Rule 33 motion, the defendant still must show that any error affected substantial rights.  *United States v. Chang*, No. 16-CR-00047-EJD-1, 2020 WL 5702131, at *15 (N.D. Cal. Sept. 24, 2020) (citing Fed. R. Crim. P. 52(a); *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020)); *see generally* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").  In determining whether this standard has been met, the Court should consider "all circumstances" at trial, including the jury instructions as a whole, the strength of the evidence against the defendant, and

arguments made by the parties.  *United States v. Garrido*, 713 F.3d 985, 995 (9th Cir. 2013).  "Where the evidence actually presented at trial and 'other language in the jury instructions' assures the court that the jury could not have based its verdict on the erroneous language in the instruction, the Ninth Circuit has found the error to be harmless."  *Chang*, 2020 WL 5702131, at *15 (quoting *Miller*, 953 F.3d at 1103).

Because Dr. Siao did not object to the jury instructions at trial, the proper standard of review here is plain error.  Under either standard, however, the motion should be denied.

## II.   The Jury Instructions Were Proper

### A.   Dr. Siao's Reading of Instruction No. 46 is Grammatically Incorrect

Instruction No. 46 required the jury to find that Dr. Siao "knowingly or intentionally acted in an unauthorized manner."  Dr. Siao's motion improperly treats the word "intentionally" as a verb instead of an adverb.  As the Chicago Manual of Style explains:

> A verb denotes the performance or occurrence of an action or the existence of a condition or a state of being, such as an emotion.  Action verbs include walk, shout, taste, and fly.  Nonaction verbs include imagine, exist, and dread.  The verb is the most essential part of speech—the only one that can express a thought by itself (with the subject understood) {Run!} {Enjoy!} {Think!}

Chicago Manual of Style ¶ 5.95 (16th ed. 2010).  An adverb, on the other hand, is generally a "word that qualifies, limits, describes, or modifies a verb, an adjective, or another adverb."  *Id.* ¶ 5.153; *see also* MODIFY, Black's Law Dictionary (11th ed. 2019) ("(Of an adjective or adverb) to describe or limit the meaning of (a noun or verb) <in the phrase drive recklessly, the adverb recklessly modifies the verb drive>.").

In Instruction No. 46, the words "knowingly" and "intentionally" are adverbs, whereas the word "acted" is the simple past tense of the verb "act."  "Knowingly" and "intentionally" therefore describe the manner in which Dr. Siao acted, not whether he acted.  *See Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009) ("In ordinary English, where a transitive verb has an object, listeners in most contexts assume that an adverb (such as knowingly) that modifies the transitive verb tells the listener how the subject performed the entire action, including the object as set forth in the sentence.").  Dr. Siao's argument improperly conflates these two forms of speech and attempts to transform the adverb "intentionally" into the verb "intend."  But whether a person "intentionally acts" or "intends to act" are

1   two fundamentally different things, and Instruction No. 46 required the jury to determine the former.

2       Dr. Siao's argument seems to suggest that inserting an adverb in a sentence before a verb replaces

3   or negates the verb itself.  In addition to being incorrect as matter of basic word usage, it would lead to an

4   absurd construction of language where the phrase "Donald Siao acted in an authorized manner" would be

5   taken to mean that he acted in an unauthorized manner, whereas the phrase "Donald Siao definitely acted

6   in an authorized manner" would say nothing of whether he acted in an unauthorized manner.

7       In sum, there was no error in Instruction No. 46, and the jury necessarily found that Dr. Siao both

8   (1) acted in an unauthorized manner and (2) did so knowingly or intentionally.

9       **B.    Instruction No. 46 is Consistent with the Ninth Circuit Model Jury Instructions**

10      Instruction No. 46 is also consistent with the Ninth Circuit Model Jury Instructions.  First, a

11  comment to Model Jury Instruction 12.4 cites precisely the same language from *Ruan* that the parties used

12  to formulate Instruction No. 46:

13          In prosecutions involving a physician charged with distributing controlled
            substances not "as authorized," if the defendant produces evidence that his
14          or her conduct was "authorized," the government must prove beyond a
            reasonable doubt that the defendant *knowingly or intentionally acted in an*
15          *unauthorized manner. Ruan v. United States*, 142 S. Ct. 2370, 2376 (2022).

16  Model Jury Instruction 12.4, cmt. (2022) (emphasis added).

17      Moreover, many of the Ninth Circuit's model jury instructions adopt the same construction used

18  by the Court in this case, combining both the *mens rea* and *actus reus* requirements in a single element.

19  *See, e.g.*, Model Jury Instruction 9.1 ("Third, the defendant intentionally [[struck or wounded [name of

20  victim]] [made a display of force that reasonably caused [name of victim] to fear bodily harm] by using a

21  [specify dangerous weapon or device]."); 12.16 ("For the defendant to be found guilty of that charge, the

22  government must prove beyond a reasonable doubt that the defendant knowingly or intentionally used [a

23  telephone] [the mail] [a radio] [a wire] to help bring about [specify illegal act or acts] as charged in [Count

24  _____ of] the indictment]."); 15.27 ("First, the defendant knowingly caused the transmission of [a

25  program] [information] [a code] [a command] to a computer; Second, as a result of the transmission, the

26  defendant intentionally impaired without authorization the [integrity] [availability] of [data] [a program]

27  [a system] [information]"); 17.1 ("Third, the defendant intentionally transported [name of kidnapped

28

1  person] across state lines."); 22.8 ("First, the defendant knowingly [transported] [was about to transport]
2  more than $10,000 in [specify monetary instrument] [[from a place in the United States to or through a
3  place outside the United States] [to a place in the United States from or through a place outside the United
4  States]]; . . . and Third, the defendant intentionally evaded the reporting requirement."); 24.18 ("Fourth,
5  the defendant intentionally failed to appear as required."); 24.19 ("Fifth, the defendant intentionally failed
6  to surrender as ordered.").

7      Indeed, one need look no further than the first element of Instruction No. 46 (to which Dr. Siao
8  does not object) to see that the Ninth Circuit has endorsed this construction, *see* Model Jury Instruction
9  12.4 ("First, the defendant knowingly [[distributed] [manufactured]] [specify controlled substance]"),
10 further demonstrating that Dr. Siao's objection with respect to the third element is unfounded.

11 **III.  Any Error With the Jury Instructions Was Harmless In Light of All the Circumstances of Trial**

12     For the reasons set forth above, there was no error in Instruction No. 46, much less plain error.
13 However, even if Dr. Siao objected at trial, he cannot show that any error affected a substantial right.

14 **A.  The Government Presented Overwhelming Evidence that Dr. Siao Wrote the Charged Prescriptions in an Unauthorized Manner**

16     First, at trial, the government presented overwhelming evidence that each of the twelve charged
17 distributions was without authorization.  For the UCs, this was proven through undercover recordings, the
18 UCs' testimony, and the UCs' patient files.  Among other things, the evidence showed that Dr. Siao never
19 obtained prior patient files for the UCs and never properly diagnosed their conditions.  Additionally, he
20 conducted very brief physical exams during only two of the seventeen UC visits, and for none of the
21 charged visits.  And, as the jury heard, he did this despite vague and inconsistent complaints of pain,
22 discomfort, and "funny feelings" from the UCs, and despite repeated and glaring red flags, including
23 multiple instances when the UCs told Dr. Siao they intended to divert their medications.  At closing, the
24 government made this clear for the jury, summarizing the evidence for each of the first four counts:

25          *Count One*

26          [Agent Bloxsom's] fifth visit, this related to Count One.

27          That's a really short clip.  Ask yourselves why that is?

28          On that day Dr. Siao ignored the red flags that had been accumulating.  Her

first visit she named Norco by name, knew the dosage; fourth visit she indicated the sharing of pills; and the fifth visit she requested Xanax by name, yet the defendant went ahead and wrote a prescription to Lacy Blackwell on February 26th, 2018 for Norco and Xanax.

There is nothing usual about that.

And if we look at the medical record, which is Exhibit 130 for Lacy Blackwell, you will see that there's no actual diagnosis made.  We don't know anything about her knee, the pain, where it is, how bad it is.  What is going on with the knee?  We don't know.

There's no documented reason for the amount that she's receiving.  And keep in mind there's been no prior medical records received.  There's been no verification that she actually has anything wrong with her.

Instead we get a prescription for Xanax, which is a sedative that you heard in combination with an opioid is incredibly dangerous.

And [Dr. Siao] has her sign a controlled substance agreement, but watch the video.  He says he needs to have it in the patient file just in case he gets audited.

There is nothing usual about that.  *This was an unauthorized distribution of Hydrocodone.*

Tr. 6/20/23 at 30:13–31:13 (emphasis added).

### *Count Two*

The fourth visit that we just watched [Agent Martin] indicated that he was doctor shopping.  He told the defendant that he had gotten pills from a clinic in Portland and that he indicated that he was going to share those pills with his coworkers.

Ladies and gentlemen, there is nothing usual about that, yet the defendant wrote a prescription to Allen McKay for 90 Norco tablets on June 18th, 2018, which is Count Two of the Superseding Indictment.

If we look at the record behind the visit, some interesting things pop up that you should pay attention to when you're back in the deliberation room.  According to this record, Allen McKay was physically examined.

You just saw what happened during the visit.  There was no physical examination that day; there was no specific discussion of pain, whether it be the elbow or the wrist; there's no documented reason for the increase, and, again, no prior medical records are ever obtained.

*This was an unauthorized distribution of Hydrocodone* and the evidence

1      shows that he knew that or intended it to be so.

2  *Id.* at 32:25–33:18 (emphasis added).

3          <u>*Count Three*</u>

4          During the second visit [Agent Maher] indicated there would be pill
           borrowing and pill sharing, yet the defendant, despite hearing those things,
5          wrote a prescription for 60 Norco tablets on April 10th, 2018, which is
6          Count Three of the Superseding Indictment.

7          And if we look at the record documenting that visit, once again, it indicates
           that there was a physical examination done.  Watch the video again, you
8          will see no physical examination performed.  There was also no specific
           discussion of pain.  He said his legs were tired and stiff, once again, there
9          are no prior medical records.

10         There is absolutely nothing usual about this.  *This distribution, the evidence*
11         *shows, was unauthorized*, and the defendant knew it or intended it to be so.

12 *Id.* at 34:24–35:12 (emphasis added).

13         <u>*Count Four*</u>

14         For Count Four on July 16th, 2018, the defendant ignored glaring red flags.

15         The first visit [Agent McGlinchey] was requesting Oxy by street name, he
16         knew the dosage when asked, and he indicated that he was borrowing pills.

17         On the third visit . . . he was very clearly signaling he planned to share the
18         pills yet the defendant wrote a prescription for 75 Oxycodone.

19         And if we look at the medical record, it says there was a physical exam
           conducted.

20
21         There was no physical exam [conducted] for Doug Kiernan during any visit,
           and there's no discussion of any specific pain.  Again, there are no prior
22         medical records.

23         *That distribution for Count Four to Doug Kiernan or Brian McGlinchey,*
           *the evidence shows was unauthorized*, and the defendant knew it or intended
24         it to be.

25 *Id.* at 36:14–37:5 (emphasis added).

26         For E.J. and A.J., the evidence of Dr. Siao's unauthorized conduct came from their patient files.

27 As with the UCs, there was no indication in the medical files that Dr. Siao ever properly diagnosed E.J.

28 or A.J.   Accordingly, there was no documentation of Dr. Siao's attempts to treat their ostensible

conditions. E.J. was supposedly receiving opioids to treat her rheumatoid arthritis, but her patient file contained no indication of testing or treatment for that condition. For A.J., Dr. Siao was supposedly prescribing opioids for Dorsalgia—a vague term for pain on the back side of the body—but there is no indication where on the body the pain was supposedly being experienced or what was causing it. As the government explained at closing regarding E.J.:

> In the record there is no specific discussion of pain. Where is she hurting? How intense is it? We don't know any of that yet the defendant writes a prescription on her very first visit with no prior history, medical history, for 90 Oxycodone. There's no workup of the other non-opioid medications, there's no trying of the ice and all of those kinds of things that you would typically see. It is not there.

*Id.* at 38:2–38:8.

Similarly, for A.J., the government summarized as follows:

> The treatment is supposedly for Dorsalgia. You heard Dr. Szabo explain what that is. That is simply back pain. That is not a diagnosis. You do not know why his back hurts, you don't know the intensity, you don't know anything, you don't know the cause. There's no pain score and there's no treatment plan. No alternatives. We're going straight to opioids.

*Id.* at 42:5–42:11.

Moreover, both E.J. and A.J. presented multiple, serious red flags, which Dr. Siao repeatedly ignored as he continued to prescribe them opioids.

For E.J., they included the following:

- April 27, 2018: Medication lost/taken at airport. *See* Trial Exh. 46-061–069.

- May 24, 2018: Evidence of drug seeking behavior. *See* Trial Exh. 53-294.

- June 14, 2018: Aetna alert; E.J.'s MME is over 90. *See* Trial Exh. 46-169.

- June 25, 2018: Aetna alert; no evidence of disease modifying rheumatoid arthritis drug. *See* Trial Exh. 46-157.

- September 27, 2018: E.J. drove into a ditch. *See* Trial Exh. 46-130.

- October 29, 2018: Dr. Siao's office is informed that E.J. is in jail for selling pills and was "not doing well" and "taken to ER." *See* Trial Exh. 46-027.

- February 13, 2019: Dr. Siao's office is informed E.J. was selling medication on the street.

*See* Trial Exh. 46-008.

For A.J., they included the following:

- May 24, 2018: Medical records show evidence of drug seeking behavior, drug overdose, opioid dependence, substance abuse (benzodiazepine), Norco reported stolen by brother, and suicidal ideation.  *See* Trial Exh. 53-164, 166, 177, 231, 263–64, 267, 294–95.

- August 16, 2018: Report of telephone encounter from E.J. "A problem has occurred [A.J.] my son who sees u guys as a patient has stolen my meds . The cough syrup the xanax left my bottle empty . He went in my purse, im filing a police report against him . He left with out nothing . He even stole my money . I need dr Siao to discharge him from his practice and seeing this is thr only medication i take . I need for him to please do another one ."  *See* Trial Exh. 46-042.

- November 26, 2018: Urinalysis positive for Amphetamine and Methamphetamine, negative for Carisoprodol and Hydrocodone.  *See* Trial Exh. 53-138.

- January 30, 2019: Lost medication during eviction.  *See* Trial Exh. 53-045.

- June 10, 2019: Dr. Siao informed of E.J.'s death.   "PER PT MOTHER CAUSE OF DEATH WAS A MIXTURE OF XANAX AND OXYCODONE STATED IT WAS CONSIDER OVERDOSE."  *See* Trial Exh. 46-005.

- August 13, 2019: Medication stolen from grandmother's car.  *See* Trial Exh. 53-017.

- September 13, 2019: Medical report (Trial Exh. 53-093, 100) indicates:
  - Seizures possibly caused by benzodiazepine withdrawal.
  - History of inaccuracy of CURES for narcotics and benzodiazepines.
  - Drug seeking behavior.
  - Doctor shopping.
  - Methamphetamine use disorder (severe).
  - Psychosis, psychotic disorder.
  - Suicide attempt by drug ingestion.
  - "Patient . . . found unresponsive in Denny's this morning.  States that he was in OCH ED [O'Connor Hospital Emergency Department] yesterday due to opioid

overdose and given narcan x 4 . Admits to taking all his medications all together including . . . Soma [and] Oxycodone."

- o "Patient was admitted for drug overdose/opioids. . . . Given recent overdose and drug seeking behaviors patient was transferred to EPS [Emergency Psychiatric Services] for future evaluation."

In light of this overwhelming evidence that Dr. Siao distributed controlled substances in an unauthorized manner, there is no possibility that the jury based its verdict on the allegedly erroneous language in the instruction.  Even accepting the premise of Dr. Siao's argument, it is unclear as a conceptual matter how a doctor intending to prescribe a controlled substance without a legitimate medical purpose could inadvertently have a legitimate medical purpose, or how intending to act outside of the usual course of professional practice is not itself outside the usual course of professional practice.

**B.    The Parties' Closing Arguments and Rebuttal Made Clear to the Jury That It Was Required to Determine Whether Dr. Siao Acted in an Unauthorized Manner**

As noted above, another factor the Court should consider when determining whether an error affected substantial rights is the arguments made by the parties.  Here, both parties repeatedly emphasized at closing that the jury was required to find that Dr. Siao had acted in an unauthorized manner.  Indeed, the government made this clear from the very beginning of its closing argument:

> When does a doctor become a drug dealer?  The law tells you that a doctor who is authorized to prescribe controlled substances becomes a drug dealer *when he or she distributes a federally controlled substances in an unauthorized manner* and that that doctor either knew that or intended to do so.

Tr. 6/20/23 at 22:19–22:24 (emphasis added).

As to each charged count, the government repeated that Dr. Siao had actually committed an unauthorized distribution.  *Id.* at 31:14–31:15 ("There is nothing usual about that.  This [Count One] was an unauthorized distribution of Hydrocodone."); *id.* at 33:17–33:18 ("This [Count Two] was an unauthorized distribution of Hydrocodone, and the evidence shows that he knew that or intended it to be so."); *id.* at 35:10–35:12 ("There is absolutely nothing usual about this.  This distribution [Count Three], the evidence shows, was unauthorized and the defendant knew it or intended it to be so."): *id.* at 37:3–37:5 ("That distribution for Count Four to Doug Kiernan or Brian McGlinchey, the evidence shows was

1   unauthorized, and the defendant knew it or intended it to be."); *id.* at 41:16–41:18 ("Counts Five, Six,

2   Seven, and Eight, the evidence shows were unauthorized, and the defendant knew it or intended it to be

3   so."); *id.* at 44:24–45:1 ("Counts Nine, Ten, Eleven, and Twelve the government submits were

4   unauthorized and the defendant knew it or intended it to be so.").  The government then concluded its

5   closing argument similarly to how it started, making clear that in order to prove its case it needed to show

6   that Dr. Siao acted without authorization: "So when does a doctor become a drug dealer?  *When they write*

7   *a prescription for a controlled substance without a legitimate medical purpose, and that is outside of the*

8   *usual course of professional practice* and when they knew that or intended it to be so."  *Id.* at 45:2–45:6

9   (emphasis added).  Thus, the government consistently addressed the element of unauthorized distribution

10  as distinct from the element of intent.

11      The defense echoed the government's closing in this respect, explaining that it was the

12  "government's burden of proof beyond a reasonable doubt" that "the treatment that was provided by Dr.

13  Siao was not medically appropriate and within the legitimate standards of medical practice."  *Id.* at 56:20–

14  56:24.  The defense later reiterated: "Once again, if there's a disagreement with the opinion, that doesn't

15  negate the fact that the prosecution is still required to prove that that opinion was not just contrary, but in

16  violation of the standard of proof, which is that the diagnosis, the treatment was within the medical

17  standard of a legitimate practice."  *Id.* at 58:7–58:12.

18      During rebuttal, the government continued to emphasize to the jury that the government was

19  required to prove that the distributions underlying the charged counts were in fact unauthorized.  *See id.*

20  at 64:18–64:21 ("The evidence must show beyond a reasonable doubt that [the charged distributions] were

21  unauthorized.  That means without a legitimate medical purpose not in the usual course of professional

22  practice."); *see also id.* at 65:8–65:13 ("Dr. Szabo made clear that based upon the proper standard of care

23  . . . all 12 of the charged prescriptions, the six patients, were not appropriate.  They were unauthorized.

24  They were without legitimate medical purpose and outside of the usual course of professional practice.").

25  The parties' arguments, therefore, conveyed that the offense had both objective and subjective elements.

26  **C.    Neither the Jury Questions nor Time of Deliberation Suggest Error**

27      Dr. Siao argues that the jury's questions regarding the standard of care suggest "debate within the

28  jury room about whether it mattered," Mot. at 10,  but the opposite conclusion is warranted.  The fact that

1   both questions were directed to the standard of care shows that the jury understood it needed to determine

2   whether Dr. Siao abided by it.  Had their debate been about whether it mattered, presumably that is what

3   the jury would have asked.

4          The government also disagrees that the jury deliberations were uncharacteristically long given the

5   nature of the trial.  Dr. Siao was charged with twelve counts, the government presented over ten witnesses

6   (including three expert witnesses), and the jury had numerous videos and hundreds of pages of patient

7   files they may have wanted to review, in addition to other exhibits.  Moreover, even if the deliberations

8   were uncharacteristically long, that could just as easily suggest that the jurors were grappling with more

9   rather than fewer elements—including the need to determine whether Dr. Siao acted in an unauthorized

10  manner.

11                                      **<u>CONCLUSION</u>**

12         For the reasons set forth above, the government requests that Dr. Siao's motion for a new trial be

13  denied in its entirety.  There was no error in Instruction No. 46, much less plain error.  And even to the

14  extent any error existed, it was harmless and did not affect Dr. Siao's substantial rights, taking into account

15  the full circumstances of the trial.

16

17  Dated: September 8, 2023                              Respectfully submitted,

18                                                        ISMAIL J. RAMSEY
                                                          United States Attorney
19

20                                                            /s/
                                                          AMANI S. FLOYD
21                                                        DAN M. KARMEL
                                                          Assistant United States Attorneys
22

23

24

25

26

27

28