UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| USA,<br><br>              Plaintiff,<br><br>       v.<br><br>DONALD SIAO,<br><br>              Defendant. | Case No.  21-cr-00267-BLF-1<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR NEW TRIAL**<br><br>[Re:  ECF No. 108] |

Following trial, a jury convicted Dr. Donald Siao of twelve counts of distributing a federally controlled substance without authorization, in violation of 21 U.S.C. § 841(a)(1).  Dr. Siao moves for a new trial under Federal Rule of Criminal Procedure 33 on the grounds that the jury was never instructed on a necessary element of the offense.  ECF No. 108 ("Mot."). The motion is opposed by the Government.  ECF No. 110 ("Opp.").  The Court heard argument on the motion on November 7, 2023.

After careful consideration, the motion is DENIED for the reasons discussed below.

## I.    BACKGROUND

### A.    Investigation

The Government's investigation into Dr. Siao began in early 2017, when a suspicious prescription written by Dr. Siao was identified in connection with a separate investigation.  Opp. at 1.  Between September 2017 and September 2018, The California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse ("BMFEA") sent four undercover law enforcement agents (the "UCs") to Dr. Siao's medical office under the guise of being patients seeking opioids.  *Id.* at 1–2.  The UCs recorded their appointments with Dr. Siao, and the Government presented those recordings as evidence at trial.  *See, e.g.*, Trial Exhs. 1B, 10B, 25A, 25B, 36A, 36B, 65A, 67A, 68A, 84A.

United States District Court
Northern District of California

1      The first undercover agent was Agent Lottie Bloxsom, who visited Dr. Siao on five

2  occasions using the alias "Lacy Blackwell." Tr. 6/12/23 at 166:17–18, 169:15–16.  During her

3  first appointment on September 19, 2017, she told Dr. Siao she wanted a prescription for Norco

4  (the brand name for Hydrocodone with Acetaminophen).  Trial Exh. 1B (Undercover recording

5  from "Lacy Blackwell" visit on September 19, 2017).  On her fourth visit, she told Dr. Siao that

6  she wanted additional pills so that she could give them to another person, explaining: "I ran out of

7  a few and . . . had to borrow a couple.  So I want to give that person their pills back . . . ."  Trial

8  Exh. 65A (Undercover recording from "Lacy Blackwell" visit on January 22, 2018).  Dr. Siao

9  responded, "Okay. I'm just going to say that you're having more pain in the knee; is that right?

10  And that you're requiring more.  Okay?"  Id.  On her fifth and final visit on February 26, 2018

11  (charged as Count One), Agent Bloxsom asked Dr. Siao for a prescription for Xanax (the brand

12  name for Alprazolam).  Trial Exh. 10B (Undercover recording from "Lacy Blackwell" visit on

13  February 26, 2018). Dr. Siao offered her 30 tablets of 0.5 mg strength Xanax, but she responded

14  that she was used to the 1 mg strength that she had previously received from a friend and asked for

15  the higher strength.  Id.  Dr. Siao then wrote a 1 mg Xanax prescription in addition to a

16  prescription for 90 tablets of 10 mg Norco.  See Trial Exh. 11 (Prescription from "Lacy Blackwell"

17  visit on February 26, 2018 (Norco; Xanax)).

18      The second undercover agent was Agent Ross Martin, who visited Dr. Siao four times

19  using the alias "Allen McKay."  Tr. 6/13/23 at 51:19–21, 55:25–56:3.  At Agent Martin's first

20  visit, he told Dr. Siao that he worked as a landscaper and that his elbow had a "funny feeling."

21  Trial Exhs. 67A (Undercover recording from "Allen McKay" visit on January 22, 2018), 68A

22  (Undercover recording from "Allen McKay" visit on January 22, 2018 (cont.)).  Dr. Siao asked

23  Agent Martin a series of questions about medication and family medical history.  Id.  After briefly

24  examining Agent Martin's elbow, Dr. Siao concluded that Agent Martin had tennis elbow or

25  golfer's elbow.  Id.  When Agent Martin asked for Norco, Dr. Siao told Agent Martin that he

26  preferred to start patients on nonopioid medications.  Id.  Agent Martin responded that he had tried

27  those, but had received Norco from his friends and found it to be effective.  Id.  Dr. Siao wrote

28  him a prescription for 30 tablets of 10 mg strength Norco.  Trial Exh. 15.  (Prescription from

2

United States District Court
Northern District of California

"Allen McKay" visit on January 22, 2018 (Norco)).  On his third visit to Dr. Siao, Agent Martin asked to increase his prescription to 70 tablets because he had given some of his pills to employees as an incentive to show up for work: "I got, uh, a couple guys on my crew – one is like a 300-pound dude . . . he encompasses the whole lawn mower.  And . . . sometimes you gotta feed him half a pill just to get him to show up."  Trial Exhs. 84A (Undercover recording from "Allen McKay" visit on May 17, 2018 (5 of 6 video)).  Dr. Siao responded by saying, "God, I'm sorry. . . . So 75 – is that what you're saying, 75 pills?"  Agent Martin stated that 70 was sufficient and Dr. Siao agreed.  *Id.*  Dr. Siao then wrote the prescription for 70 tablets of 10 mg strength Norco.  *Id.* At his fourth appointment with Dr. Siao on June 18, 2018 (charged as Count Two), Agent Martin requested his prescription be increased to 90 tablets because he had run out during a concert he attended and had to visit a local clinic for refills.  *Id.*  Dr. Siao said that he could not prescribe more than 100 tablets because the "DEA is really cracking down on doctors not prescribing too much."  *Id.*  Dr. Siao then wrote Agent Martin a prescription for 90 tablets of 10 mg strength Norco.  Trial Exh. 21 (Prescription from "Allen McKay" visit on June 18, 2018 (Norco)).

The third undercover agent was Agent Eric Maher, who visited Dr. Siao four times using the alias "Eric Thrasher."  Tr. 6/13/23 at 106:10–15.  At his second appointment with Dr. Siao on April 10, 2018 (charged as Count Three), Agent Maher said that he had run out of Norco and had to borrow from others since his last appointment.  Trial Exhs. 25A (Undercover recording from "Eric Thrasher" visit on April 10, 2018 (intro)), 25B (Undercover recording from "Eric Thrasher" visit on April 10, 2018 (visit)).  Agent Maher asked Dr. Siao to increase his prescription to 60 tablets to pay back a person from whom he had borrowed pills.  *Id.*  Dr. Siao wrote Agent Maher a prescription for 60 tablets of 10 mg strength Norco.  Trial Exh. 26 (Prescription from "Eric Thrasher" visit on April 10, 2018 (Norco)).  Aside from the first visit, Dr. Siao did not conduct any physical examination of Agent Maher, and he never obtained his prior medical records.  Trial Exh. 133 (patient file for Eric Thrasher).  Dr. Siao's patient file for Agent Maher indicates that he was being treated for "Chronic pain disorder."  *Id.* at -019.  It did not contain a diagnosis or specify the location of Agent Maher's pain.  *Id.*

The fourth undercover agent was Agent Brian McGlinchey, who visited Dr. Siao four

times using the alias "Doug Kiernan." Tr. 6/13/23 at 154:7–155:4. During his third appointment on July 16, 2018 (charged as Count Four), Agent McGlinchey told Dr. Siao that he had to share some of his previous month's prescription with a co-worker and asked to get an increased dosage. Trial Exhs. 36A (Undercover recording from "Doug Kiernan" visit on July 16, 2018 (intro)), 36B (Undercover recording from "Doug Kiernan" visit on July 16, 2018 (visit)). Dr. Siao agreed to write a prescription for 70 tablets, instead of 60, and said that he would have to write in the prescription that the medication was to be taken three times daily, but verbally directed Agent McGlinchey not to take it three times per day. *Id.* Dr. Siao said that he "had to change [the prescription] to three times a day in order to justify increasing it." *Id.* Dr. Siao then said he would increase the prescription to 75 tablets if it was okay with Agent McGlinchey. *Id.* He then wrote Agent McGlinchey a prescription for 75 tablets of 30 mg strength Oxycodone. Trial Exh. 37 (Prescription from "Doug Kiernan" visit on July 16, 2018 (Oxycodone)).

The government also presented evidence related to E.J. and A.J., two of Dr. Siao's actual patients. Opp. at 2. E.J. first visited Dr. Siao on April 9, 2018, and her patient file indicates that she was being treated by Dr. Siao for rheumatoid arthritis and an unspecified anxiety disorder. *Id.* at 7–8 (citing Trial Exh. 46 (Medical Records for patient E.J.)). Throughout the course of E.J.'s treatment, which lasted until her death less than a year later, Dr. Siao wrote E.J. multiple prescriptions for Oxycodone and Alprazolam. Trial Exh. 46; Tr. 6/16/23 at 107:15–108:25. E.J.'s patient file contained no evidence of laboratory findings consistent with rheumatoid arthritis or any description of the pain in terms of location, intensity, quality, or response to medications. *Id.*

E.J. presented several red flags. E.J. repeatedly requested early refills because of supposedly lost or stolen medications, including on August 15, 2018, when she claimed that her medication was stolen by her son, A.J., whom she specifically noted was also a patient of Dr. Siao's. *Id.* at -042 ("A problem has occurred [A.J.] my son who sees u guys as a patient has stolen my meds."); *id.* at -061–069 (April 27, 2018: Medication lost/taken at airport). According to E.J.'s patient file, on October 29, 2018, E.J.'s mother called to say that E.J. was in jail for selling pills, "was not doing well," and was taken to the ER. *Id.* at -027. Two weeks before E.J.'s death, Dr. Siao's office was informed that E.J. was selling medication on the street. *Id.* at -008.

United States District Court
Northern District of California

1    E.J. was found deceased on February 27, 2019, two weeks after her last visit to Dr. Siao.

2    *Id.* According to the Report of Autopsy, her cause of death was "Mixed drug toxicity (alprazolam

3    and oxycodone)" and her manner of death was determined to be an accident.  *Id.* at -005.  Dr. Siao

4    prescribed E.J. Alprazolam and Oxycodone on multiple occasions, including during her last visit

5    to his office on February 13, 2019.  *Id.*

6    A.J. first visited Dr. Siao on May 24, 2018, at which time Dr. Siao wrote that A.J. had

7    chronic pain disorder and unspecified Dorsalgia, which is a general term for back pain.  Trial Exh.

8    53 (Medical Records for patient A.J.).  Throughout the course of his treatment, which lasted until

9    December 3, 2019, Dr. Siao wrote A.J. multiple prescriptions for controlled substances, including

10   the opioids Hydrocodone and Oxycodone.  *Id.*  Dr. Siao never identified the cause of A.J.'s pain,

11   and over the entire course of treatment there was no description of the pain in terms of location,

12   intensity, quality, or response to medications.  *Id.*; Tr. 6/14/23 at 158:21–159:1.

13   A.J. also presented several red flags.  For example, there were indications of diversion or

14   abuse and an inconsistent drug test showing the absence of Hydrocodone and the presence of

15   Methamphetamine.  *Id.* at -138.  A.J.'s patient file also included diagnoses of drug seeking

16   behavior, opioid dependence, and moderate use disorder, and a drug overdose on September 13,

17   2019, where A.J. was found unresponsive in a Denny's.  *Id.* at -093, -100.

**B.    Charges**

19   Dr. Siao was charged with five counts of Distributing Hydrocodone Outside the Scope of

20   Professional Practice and seven counts of Distributing Oxycodone Outside the Scope of

21   Professional Practice.  ECF No. 39 ("Superseding Indictment").  Counts One through Four of the

22   Superseding Indictment relate to the prescriptions Dr. Siao wrote for the UCs.  *Id.*  The final eight

23   counts relate to prescriptions Dr. Siao wrote for E.J. (Counts Five through Eight) and A.J. (Counts

24   Nine through Twelve).  *Id.*

**C.    Trial**

26   Trial commenced with jury selection on June 9, 2023.  ECF No. 83.  "[T]he government

27   presented over ten witnesses (including three expert witnesses), and the jury had numerous videos

28   and hundreds of pages of patient files."  Opp. at 25.

United States District Court
Northern District of California

The Government submitted expert testimony by Dr. Charles Szabo, who is board certified in pain medicine. *Id.* at 10; Tr. 6/14/23 at 84:20-25, 90:20–91:2. Dr. Szabo first testified about the standard of care required for prescribing opioids, treatment guidelines set by the CDC and Medical Board of California, patient red flags, and general dangers of prescribing opioids. Tr. 6/14/23 at 92:14–110:15. Dr. Szabo then assessed Dr. Siao's treatment of the UCs, E.J., and A.J. *Id.* at 110:16–159:1. With respect to the UCs, Dr. Szabo testified that Dr. Siao often failed to conduct physical examinations of the patients or identify the cause of the pain before diagnosing opioids. *Id.* at 135:9–14, 140:12–140:17. Dr. Szabo testified that none of the four charged UC prescriptions was given within the usual course of professional practice or with a legitimate medical purpose. *Id.* at 125:6–24, 130:17–22, 134:12–15, 138:24–139:1. Dr. Szabo also concluded that the prescriptions to E.J. were without a legitimate medical purpose and outside the usual course of professional practice. *Id.* at 156:23–157:6. Dr. Szabo provided similar testimony regarding A.J., noting that "similar to the other case, there seemed to be no documentation of a clear painful diagnosis that required treatment with controlled substances," and there were "multiple red flags in terms of the patient's behavior." *Id.* at 157:14–157:20.

The Government also put on Special Agent Supervisor Charles Vela, who testified about several statements made by Dr. Siao as evidence that Dr. Siao was aware of the proper standard of care. Opp. at 12. Dr. Siao "[a]cknowledged he was familiar with and tried to adhere to the Medical Board of California Guidelines for Prescribing Controlled Substances for Pain" (Opp. at 13 (citing Tr. 6/16/23 at 13:4–14:9, Trial Exhs. 60A and 98)), "[c]laimed to conduct exams of patients every time he saw them." (*id.* (citing Tr. 6/16/23 at 14:10–19, Trial Exhs. 60B and 60C)), and "[c]laimed that if he became aware of a patient selling pills he would no longer work with that patient, and that prescribing pills to patients who said they would share the pills was a 'no no.'" (*id.* (citing Tr. 6/16/23 at 15:21–17:6, Trial Ex. 60E)).

Dr. Siao testified at trial in his own defense that "his treatment of all six patients was appropriate and for a legitimate medical purpose." Tr. 6/16/23 at 93:15–93:21. On cross-examination, Dr. Siao acknowledged that he had been taught how to treat patients, how to conduct a physical exam, about the dangers of addiction, and how to identify drug seeking patients. *Id.* at.

97:10–97:19.  He also acknowledged that part of his job as a gatekeeper was to sometimes refuse to prescribe opioids to patients, even if they requested them and claimed to be in pain.  *Id.* at 97:20–98:11.  Finally, Dr. Siao acknowledged that he was informed no later than June 2019 that E.J. had died of a drug overdose from a mixture of Xanax and Oxycodone and that he continued thereafter to prescribe opioids to A.J.  *Id.* at 107:15–108:25.

### D.   Jury Instructions

Before trial, the parties filed joint proposed instructions including Stipulated Instruction No. 46.  (ECF No. 65 at 53), which listed four elements:

> First, Donald Siao knowingly or intentionally distributed the controlled substance specified in the count on the date specified;
>
> Second, Donald Siao knew that it was the controlled substance specified in the count or some other federally controlled substance;
>
> Third, the distribution of the controlled substance was outside the usual course of professional practice and without a legitimate medical purpose; and
>
> Fourth, the defendant knowingly or intentionally distributed the substance without a legitimate purpose and outside the usual course of his professional practice.

On June 16, 2023, after both parties rested their cases at trial, the Court held a jury instruction conference.  ECF No. 89.  This conference was off the record and is not reflected in the transcripts, but Counsel were consistently invited to place on the record any objections to the jury instructions.

Following the conference, the Court replaced the third and fourth elements of Stipulated Instruction No. 46 with a single third element (the first and second elements remained unchanged). The final version of the instruction, as read to the jury, listed three elements:

> First, Donald Siao knowingly or intentionally distributed the controlled substance specified in the count on the date specified;
>
> Second, Donald Siao knew that it was the controlled substance specified in the count or some other federally controlled substance;
>
> Third, Donald Siao knowingly or intentionally acted in an unauthorized manner.  "Unauthorized manner" means that the distribution of the controlled substance was outside the usual course of professional practice and without a legitimate medical purpose.

ECF No. 94 at 43 ("Instruction No. 46").  The transcript does not include any discussion about or objection to this instruction.

### E.   Verdict

After 7.5 hours of deliberation over two court days, the jury returned unanimous guilty verdicts against Dr. Siao on all 12 counts.  ECF No. 95.  A sentencing hearing for Dr. Siao is set for February 27, 2024.  ECF No. 113.  Dr. Siao seeks a new trial under Rule 33.  ECF No. 108.

## II.   LEGAL STANDARD

Under Federal Rule of Criminal Procedure 33, a "court may vacate any judgment and grant a new trial if the interest of justice so requires."  *United States v. Kramer*, No. 16-CR-00322-EJD-1, 2020 WL 5408165, at *5 (N.D. Cal. Sept. 9, 2020).  Rule 33 motions, however, "are generally disfavored and should only be granted in 'exceptional' cases."  *United States v. Nubla*, No. 21-CR-00139-RS, 2023 WL 5181636, at *1 (N.D. Cal. Aug. 11, 2023) (quoting *United States v. Del Toro–Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012)).  "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted."  *Id.* (citations omitted).

## III.   DISCUSSION

### A.   Plain Error Standard Applies

Dr. Siao argues that the prejudicial error standard should apply instead of the plain error standard.  Mot. at 8.  According to Dr. Siao, an error in omitting an element of the offense in a jury instruction is prejudicial and requires a new trial unless it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error."  Mot. at 5 (citing *United States v. Thongsy*, 577 F.3d 1036, 1043 (9th Cir. 2009)); *see also Neder v. United States*, 527 U.S. 1, 18 (1999).

The Government responds that "[w]here, as here, a defendant did not object to a jury instruction or an omission from a jury instruction, a court reviews for plain error."  Opp. at 15 (citing *Kramer*, 2020 WL 5408165, at *5); *see also United States v. Fuchs*, 218 F.3d 957, 961 (9th Cir. 2000).

United States District Court
Northern District of California

The Court agrees with the Government.  Dr. Siao never objected to the instructions.  Dr. Siao acknowledges that "[t]he transcripts do not reflect any objection to the revised Instruction No. 46" (Mot. at 11; *see also id.* at 6) but argues that even under the plain error standard a new trial is still required.

### B.    The Court Did Not Commit Plain Error

To show a trial court has committed plain error, the defendant must show "(1) there is error, (2) that is plain [i.e., clear and obvious], and (3) the error affects substantial rights [i.e., affects the outcome of the proceedings]."  *United States v. Ramirez-Ramirez*, 45 F.4th 1103, 1109 (9th Cir. 2022) (quoting *United States v. Shields*, 844 F.3d 819, 823 (9th Cir. 2016)) (alterations in original).

The Court addresses the first two elements, whether there is plain error, in this section, and the third element, whether any error affected substantial rights, in the next section.  Dr. Siao makes two arguments that the Court committed plain error: 1) that Instruction No. 46 is formulated such that the objective element (*actus reus*) is not required; and 2) that Instruction No. 46 is inconsistent with Ninth Circuit law.  Mot. at 5–7, 11.

#### i.    Instruction No. 46 Does Not Omit the Objective (*Actus Reus*) Element

Dr. Siao argues that Instruction No. 46 "omitted a contested element of the offense in violation of Dr. Siao's Fifth Amendment right to due process."  *Id.* at 7.  Instruction No. 46 states in relevant part:

> Third, Donald Siao **knowingly or intentionally acted in an unauthorized manner**.  "Unauthorized manner" means that the distribution of the controlled substance was outside the usual course of professional practice and without a legitimate medical purpose.

ECF No. 94 at 43 (emphasis added).  Dr. Siao defines the term "the standard of care" as "the usual course of professional practice and with a legitimate medical purpose."  Mot. at 3.  Dr. Siao then argues that Instruction No. 46 "references the standard of care only with respect to the element of criminal intent."  *Id.* at 7 (citing ECF No. 94 at 43).  As Dr. Siao explains, "[the unauthorized manner] definition merely tells the jury how to determine whether Dr. Siao intended to act in an unauthorized manner."  *Id.*  Rather, he argues, "[t]here is no instruction informing the jurors that

United States District Court
Northern District of California

the prescriptions must have in fact been outside the standard of care." *Id.*  Basically, Dr. Siao argues that because the *mens rea* ("knowingly or intentionally") and *actus reus* ("acted in an unauthorized manner") are combined into one sentence, Instruction No. 46 does not actually require a finding of the *actus reus*.

The Government responds that "Dr. Siao's motion improperly treats the word 'intentionally' as a verb instead of an adverb."  Opp. at 16.  The Government explains that in Instruction No. 46, the words "knowingly" and "intentionally" are adverbs, whereas the word "acted" is the simple past tense of the verb "act."  *Id.*  Thus, the Government argues, "knowingly" and "intentionally" merely describe the way Dr. Siao acted, not whether he acted.  *Id.*

The Court agrees with the Government that Instruction No. 46 clearly requires the jury to find both the subjective (*mens rea*) and objective (*actus reus*) elements.  "[T]he inquiry into a sentence's meaning is a contextual one."  *Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009).  Given the context and plain meaning of the words, the only reasonable interpretation of a sentence that combines the elements such that the *mens rea* modifies the *actus reus* still requires the jury to find that the *actus reus* element was met.  Here, Instruction No. 46 requires the jury to find that "Donald Siao knowingly or intentionally acted in an unauthorized manner."  Placing the *mens rea* (the adverbs "knowingly or intentionally") in front of the *actus reus* (that Dr. Siao "acted in an unauthorized manner") does not change that the jury must still find that Dr. Siao acted in an "unauthorized manner" in the first place.

### ii.   Instruction No. 46 is Consistent with *Ruan* and Ninth Circuit Law and Model Instructions

Dr. Siao further contends that Instruction No. 46 is incorrect under Ninth Circuit's decision in *Feingold*, which he states is unchanged by the Supreme Court's recent decision in  *Ruan v. United States*, 142 S.Ct. 2370, 2375 (2022).  Mot. at 5.

Ninth Circuit law prior to *Ruan* provides that the elements of 21 U.S.C. § 841(a)(1) for a prosecution against a doctor who is authorized to prescribe controlled substances are: "(1) that the practitioner distributed controlled substances, (2) that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical

United States District Court
Northern District of California

1    purpose, and (3) that the practitioner acted with intent to distribute the drugs and with intent to

2    distribute them outside the course of professional practice."  *United States v Diaz*, 876 F.3d 1194,

3    1196 (9th Cir. 2017) (quoting *United States v. Feingold*, 454 F.3d 1001, 1008 (9th Cir. 2006));

4    Mot. at 5.

5            The Supreme Court recently addressed the *mens rea* requirements for § 841 in *Ruan*,

6    where it heard appeals from two doctors convicted of "unlawfully dispensing and distributing

7    drugs" under the statute.  142 S.Ct. at 2375.  In the first case, the trial court "instruct[ed] the jury

8    that a doctor acts lawfully when he prescribes in good faith as part of his medical treatment of a

9    patient in accordance with the standard of medical practice generally recognized and accepted in

10   the United States."  *Id.* (internal quotation omitted).  The defendant was convicted, and the

11   Eleventh Circuit affirmed, holding that "a doctor's 'subjectiv[e] belie[f]' that he is meeting a

12   patient's medical needs by prescribing a controlled substance' is not a 'complete defense' to a §

13   841 prosecution."  *Id.* at 2376 (quoting *United States v. Ruan*, 966 F.3d 1101, 1167 (11th Cir.

14   2020)).

15          In the second case reviewed in *Ruan*, the trial court "instructed the jury that it should not

16   convict if it found that [the defendant] acted in good faith, defined as an attempt to act in

17   accordance with what a reasonable physician should believe to be proper medical practice" and

18   added "that to find good faith, the jury must conclude that [the defendant] acted in an honest effort

19   to prescribe for patients' medical conditions in accordance with generally recognized and accepted

20   standards of practice."  *Id.* (internal quotation omitted).  The defendant was convicted, and the

21   Tenth Circuit affirmed, holding "that to convict under § 841, the Government must prove that a

22   doctor 'either: (1) subjectively knew a prescription was issued not for a legitimate medical

23   purpose; or (2) issued a prescription that was objectively not in the usual course of professional

24   practice.'"  *Id.* at 2376 (quoting *United States v. Khan*, 989 F.3d 806, 825 (10th Cir. 2021)).

25          The Supreme Court held that "the Court of Appeals in both cases evaluated the jury

26   instructions under an incorrect understanding of § 841's scienter requirements."  *Ruan*, 142 S.Ct.

27   at 2382.  The Supreme Court first explained that the correct standard is "that § 841's 'knowingly

28   or intentionally' *mens rea* applies to the 'except as authorized' clause."  *Id.* at 2376.  "This means

                                              11

that once a defendant meets the burden of producing evidence that his or her conduct was 'authorized,' the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner." *Id.* Finding that neither lower court applied that standard, the Supreme Court vacated and remanded both convictions for the appellate courts to reassess the jury instructions. *Id.* at 2382.

Dr. Siao argues that the Ninth Circuit "require[s] the government to prove that the doctor intentionally acted outside the usual course of practice." Mot. at 5 (citing *Feingold*, 454 F.3d at 1007–08). Dr. Siao argues that *Feingold* is consistent with *Ruan*, and that the government must prove "that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so." *Id.* (quoting *Ruan*, 142 S.Ct. at 2374). Dr. Siao adds that "[n]othing in *Ruan* disturbs the Ninth Circuit's longstanding rule that, in addition to proving criminal intent, the government must also prove that the distribution was in fact outside the standard of care." *Id.*

The Government doesn't disagree with any of Dr. Siao's arguments about what the Supreme Court and Ninth Circuit require, but responds instead that the formulation used by the Court is consistent with both *Ruan* and the Ninth Circuit Model Jury Instructions. Opp. at 17–18.

The Court agrees with Dr. Siao that nothing in *Ruan* directly overrules *Feingold*. But that is not the precise issue before the Court. The issue instead is whether *Ruan* or *Feingold* suggest that the Court committed plain error in giving Instruction No. 46. To that issue, the Court finds no plain error.

Instead, the Court finds that Instruction No. 46 is consistent with *Ruan*, Ninth Circuit law, and the Ninth Circuit Model Jury Instructions. First, a comment to Model Jury Instruction 12.4 cites to *Ruan* and uses the same language used in Instruction No. 46:

> In prosecutions involving a physician charged with distributing controlled substances not "as authorized," if the defendant produces evidence that his or her conduct was "authorized," the Government must prove beyond a reasonable doubt that the defendant ***knowingly or intentionally acted in an unauthorized manner***. *Ruan v. United States*, 142 S.Ct. 2370, 2376 (2022).

Model Jury Instruction 12.4, cmt. (2022) (emphasis added); *compare Ruan*, 142 S.Ct. at 2376 ("the Government must prove beyond a reasonable doubt that the defendant ***knowingly or***

*intentionally acted in an unauthorized manner*") *with* Instruction No. 46 ("Third, Donald Siao *knowingly or intentionally acted in an unauthorized manner*").  Because they use identical language, Instruction No. 46 is clearly consistent with *Ruan*.

Instruction No. 46 is also consistent with *Feingold*.  In *Feingold*, the Ninth Circuit affirmed a § 841(a) conviction despite the defendant's argument that "the instructions permitted the jury to convict him without an adequate determination of his *mens rea*."  454 F.3d at 1007. While the court found that the given instructions required proof of state of mind, it recommended combining the *mens rea* and *actus reus* elements into the same sentence, writing, "the [jury] instructions would have been clearer if they had stated that 'the government must prove beyond a reasonable doubt that the defendant intentionally prescribed or distributed the controlled substance other than for a legitimate medical purpose and not in the usual course of professional practice.'" *Id.* at 1008–09.  That combination of the *mens rea* and *actus reus* into one sentence is exactly what the Instruction No. 46 did here; albeit with the additional step of defining "unauthorized manner" in the subsequent sentence, consistent with the holding in *Ruan*.

Moreover, many of the Ninth Circuit Model Jury Instructions adopt the same construction used in Instruction No. 46, combining both the *mens rea* and *actus reus* requirements into a single sentence.  *See, e.g.*, Model Jury Instruction 9.1 ("Third, the defendant intentionally [[struck or wounded [name of victim]] [made a display of force that reasonably caused [name of victim] to fear bodily harm] by using a [specify dangerous weapon or device]."); 12.16 ("For the defendant to be found guilty of that charge, the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally used [a telephone] [the mail] [a radio] [a wire] to help bring about [specify illegal act or acts] as charged in [Count_____ of the indictment]."); 15.27 ("First, the defendant knowingly caused the transmission of [a program] [information] [a code] [a command] to a computer; Second, as a result of the transmission, the defendant intentionally impaired without authorization the [integrity] [availability] of [data] [a program] [a system] [information]"); 17.1 ("Third, the defendant intentionally transported [name of kidnapped person] across state lines."); 22.8 ("First, the defendant knowingly [transported] [was about to transport] more than $10,000 in [specify monetary instrument] [[from a place in the United States to or

through a place outside the United States] [to a place in the United States from or through a place outside the United States]]; . . . and Third, the defendant intentionally evaded the reporting requirement."); 24.18 ("Fourth, the defendant intentionally failed to appear as required."); 24.19 ("Fifth, the defendant intentionally failed to surrender as ordered."); *see* Opp. at 17–18. The instructions show it is common practice in the Ninth Circuit to combine the *mens rea* and *actus reus* elements into a single sentence.

*    *    *

In sum, Instruction No. 46 contains no grammatical ambiguity and matches the Supreme Court's language in *Ruan*, follows the Ninth Circuit's recommendation in *Feingold*, and matches the template of many other Ninth Circuit Model Jury Instructions. The Court concludes that it committed no plain error in giving Instruction No. 46.

### C.    Any Error Did Not Affect Substantial Rights

Even if Dr. Siao were to show that there was plain error in Instruction No. 46, he must also show that "the error affects substantial rights [i.e., affects the outcome of the proceedings]." *Ramirez-Ramirez*, 45 F.4th 1103 at 1109 (quoting *Shields*, 844 F.3d at 823).

Dr. Siao makes three arguments that the purported error affected substantial rights: 1) that he presented sufficient evidence that the jury could have found in his favor if properly instructed (Mot. at 7–9); 2) that the jury's questions suggest prejudice (*id.* at 9–10); and 3) that the deliberation time suggest prejudice (*id.* at 10). The Court addresses each in turn.

### i.    The Government Presented Overwhelming Evidence to Convict Dr. Siao

Dr. Siao argues that he "raise[d] evidence sufficient to support a different verdict." Mot. at 8. Dr. Siao testified at trial that "his prescriptions to the undercover patients and to [E.J. and A.J.] were appropriate and within the standard of care." Tr. 6/13/23 at 85–86 (Agent Bloxsom), 88 (Agent Martin), 89 (Agent Maher), 90–91 (Agent McGlinchey), 92 (E.J.), 93 (A.J.). Dr. Siao claims that "this testimony on its own was sufficient evidence that the jury could have found in favor of the defendant if properly instructed." Mot. at 9 (quotations omitted).

The Government responds with a mountain of evidence that "each of the twelve charged distributions was without authorization." *See* Opp. at 18–23.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Specifically, as the Government explains, the trial record shows that Counts One through Four (the UC charges) "[were] proven through undercover recordings, the UCs' testimony, and the UCs' patient files." *Id.*  In support of Count One, the evidence consisting of recordings and prescriptions shows that Dr. Siao increased the prescribed dosage of Norco in response to Agent Bloxsom saying she was used to a higher dosage she had received from a friend.  Trial Exh. 10B (Undercover recording from "Lacy Blackwell" visit on February 26, 2018); Trial Exh. 11 (Prescription from "Lacy Blackwell" visit on February 26, 2018 (Norco; Xanax)).  In support of Count Two, the evidence consisting of recordings and prescriptions shows that Dr. Siao refilled Agent Martin's prescription after being told he had run out during a concert.  Trial Exh. 20B (Undercover recording from "Allen McKay" visit on June 18, 2018); Trial Exh. 21 (Prescription from "Allen McKay" visit on June 18, 2018 (Norco)).  In support of Count Three, evidence consisting of recordings and prescriptions shows that Dr. Siao increased Agent Maher's Norco prescription to 60 tablets in order to pay back the person from whom he had borrowed.  Trial Exh. 25A (Undercover recording from "Eric Thrasher" visit on April 10, 2018 (intro)); Trial Exh. 25B (Undercover recording from "Eric Thrasher" visit on April 10, 2018 (visit)); Trial Exh. 26 (Prescription from "Eric Thrasher" visit on April 10, 2018 (Norco)).  In support of Count Four, the evidence consisting of recordings and prescriptions shows that Dr. Siao increased Agent McGlinchey's prescription because he told Dr. Siao he had to share some of his previous month's prescription with a co-worker and asked to get an increased dosage.  Trial Exh. 36A (Undercover recording from "Doug Kiernan" visit on July 16, 2018 (intro)); Trial Exh. 36B (Undercover recording from "Doug Kiernan" visit on July 16, 2018 (visit)); Trial Exh. 37 (Prescription from "Doug Kiernan" visit on July 16, 2018 (Oxycodone)).

The Government also presented evidence at trial showing that E.J. and A.J. presented multiple, serious red flags, which Dr. Siao repeatedly ignored as he continued to prescribe them opioids.  E.J.'s medical records, admitted as Trial Exhibit 46, show that Dr. Siao wrote E.J. prescriptions for Oxycodone and Alprazolam as part of her treatment for rheumatoid arthritis and unspecified anxiety disorder.  Trial Exh. 46 (Medical Records for patient E.J.).  Despite that, E.J.'s patient file contained no evidence of laboratory findings consistent with rheumatoid arthritis or

15

any description of the pain in terms of location, intensity, quality, or response to medications. *Id.* E.J.'s medical records also showed that she presented multiple, serious red flags. *Id.* at -027 (October 29, 2018: Dr. Siao's office is informed that E.J. is in jail for selling pills and was "not doing well" and "taken to ER."); *id.* at -008 (February 13, 2019: Dr. Siao's office is informed E.J. was selling medication on the street.).

A.J.'s medical records, admitted as Trial Exhibit 53, show that Dr. Siao wrote A.J. prescriptions for Hydrocodone and Oxycodone as part of his treatment for Dorsalgia. Trial Exh. 53 (Medical Records for patient A.J.). A.J.'s medical records also showed that he presented multiple, serious red flags. *Id.* at -138 (November 26, 2018: A.J.'s Urinalysis positive for Amphetamine and Methamphetamine, negative for Carisoprodol and Hydrocodone); *id.* at -093, 100 (September 13, 2019 Medical report indicates: Seizures possibly caused by benzodiazepine withdrawal, History of inaccuracy of CURES for narcotics and benzodiazepines, Drug seeking behavior, Doctor shopping, Suicide attempt by drug ingestion.).

The Government's witnesses presented further evidence that Dr. Siao's conduct was without a legitimate medical purpose and outside the usual course of professional practice. For example, Dr. Charles Szabo, who is board certified in pain medicine, testified for over three hours on direct examination as a government expert witness on the standard of care in pain management. Tr. 6/14/23 at 84:20-25, 90:20–91:2.

As part of this testimony, Dr. Szabo provided the jury with background on the nature of pain and pain management, and laid out the fundamental criteria that define the proper standard of care. Dr. Szabo emphasized three core pillars:

> [First,] when you're seeing a patient, you need to make a diagnosis of what is going on so you know what to treat and how to treat it.
>
> Number two, you need to start a treatment program and follow up regularly . . . to make sure what you're doing is working.
>
> And the third thing is do no harm. You have to make sure that whatever treatment you're doing, you're not hurting the patient.
>
> So that's what you need to remember: diagnosis, follow up in treatment, and do no harm.

*Id.* at 92:14–93:1; *see also id.* at 110:2–110:15. According to Dr. Szabo, those are "the three

United States District Court
Northern District of California

things that . . . are most important in seeing patients." *Id.* at 109:25–110:1.

Dr. Szabo thereafter explained what must be included in the process of diagnosing a patient, including identifying where the pain is (*id.* at 94:24–94:25, 96:10), describing how the patient is experiencing the pain (e.g., "Is it radiating?") (*id.* at 94:25–95:1, 96:10–96:12), quantifying the severity of the pain (*id.* at 95:12–95:14, 96:10), and determining its duration (*id.* at 95:1–95:3). Critically, he explained that the process of diagnosing requires attempting to determine the cause and origin of the pain: "When you see a patient with pain, you need to diagnose where it is causing the pain and where it's coming from. It's not always easy, but it's something that needs to be thought of and approached every time you see a patient, you need to try to verify." *Id.* at 96:18–96:22. Dr. Szabo also explained the need to begin treatment with non-opioid alternatives: "You go from least invasive to the most invasive. So heat and ice, simple." *Id.* at 97:8–97:9. "We use the non-opioid medications first because the opioids, as we know, can be addictive and have a lot of problems." *Id.* at 98:6–98:8. Dr. Szabo said, "you try to stay away from [opioids] because there's a physical dependence which can occur," "you use them with as low dosage as possible," and "basically your whole goal when using opioids is to try to get off the opioids." *Id.* at 99:15–19. Dr. Szabo also explained that to abide by the basic standard of care, "you need to obtain a medical history" for the patient, "you have to do a physical examination each time the patient comes in," and "you have to have accurate records, it's absolute." *Id.* at 100:23–101:9.

Dr. Szabo also testified about the dangers and red flags associated with prescribing opioids and treatment guidelines set by the CDC and Medical Board of California. *Id.* at 101:20–104:9. "When you see patients, there are certain things that you look for that are what we call red flags. . . . So, for instance, use of street drugs. That's not a person who you want to give opioids to if they're already abusing illicit substances." *Id.* at 102:15–102:24. Other red flags Dr. Szabo identified were a past history of substance abuse (*id.* at 103:4), patients requesting specific medications by name (*id.* at 103:7–103:11), patients going to multiple pharmacies (*id.* at 103:12), lost prescriptions (*id.* at 103:17–103:19), young people complaining of chronic pain (*id.* at 103:20–103:21), dosages of more than 50 morphine milligram equivalents (MMEs) per day, (*id.* at

103:23–104:2), and the use of opioids in combination with benzodiazepines, which Dr. Szabo explained "increase[s] the risk of overdose by four fold alone" (*id.* at 104:4–104:8).

Dr. Szabo then proceeded to assess Dr. Siao's treatment of the UCs, E.J., and A.J. and explained why none of the charged prescriptions were within the usual course of professional practice or with a legitimate medical purpose.

Dr. Szabo first reviewed the patient file, recordings of office visits, and prescriptions for Lacy Blackwell (Agent Bloxsom). *Id.* at 117:24–126:10.  Dr. Szabo read from her patient file, which said, "pain due to occupation. Feels it in knees and other scattered areas. Has not seen any specialists for her pain. Does not have the finances for specialists." *Id.* at 120:12–23.  On Ms. Blackwell's first visit, Dr. Siao assessed that she had "pain in unspecified knee" and prescribed 45 Norco tablets.  *Id.*  Dr. Szabo concluded that it was not appropriate for Dr. Siao to prescribe Norco because Ms. Blackwell had no history of knee pain, no diagnosis, no physical exam of the knee. *Id.* at 121:3–22.  Dr. Szabo then reviewed Ms. Blackwell's second visit, where Dr. Siao increased the prescription to 60 Norco tablets, Ms. Blackwell's third visit, where Dr. Siao increased the prescription to 75 Norco tablets, and Ms. Blackwell's fourth visit, where Dr. Siao increased the prescription to 90 Norco tablets.  *Id.* at 121:23–124:3.  Dr. Szabo testified that these increases were not warranted:

> We don't really know what her pain levels are, we don't know what increasing improvement in level of function is.  I don't know what that means.
>
> And if someone is getting better, why add on more opioids? it doesn't make a lot of clinical sense.  So I would say it would be inappropriate. I mean, Norco was inappropriate in the first place. adding on to it would not be appropriate."

*Id.* at 124:6–13.  Finally, Dr. Szabo reviewed a fifth visit where Dr. Siao prescribed Ms. Blackwell Xanax in addition to the Norco 90-tablet refill because she was "having more stress." *Id.* at 124:23–125:5.  When asked about the opioid prescriptions written by Dr. Siao to Ms. Blackwell, Dr. Szabo stated, "I did not think that they were appropriate due to the lack of documentation of the disease and a multitude of other things." *Id.* at 118:12–17.  Dr. Szabo concluded that the prescriptions were given to Ms. Blackwell without a legitimate medical reason or purpose. *Id.* at

125:6–24.

Dr. Szabo then reviewed the patient file, recordings of office visits, and prescriptions for Allen McKay (Agent Martin). *Id.* 126:18–130:22  In his first visit, Mr. McKay claimed he had "right elbow pain" to which Dr. Siao  prescribed 30 Norco tablets. *Id.* 126:23–127:7.  Dr. Szabo testified that the prescription was not appropriate:

> Well, first of all, again, we don't have any history of elbow pain. . . .
>
> So, you know, following the, you know, protocol that we established earlier, there should be a history of this pain.  It should be – past medical record should be elicited. There needs to be a physical exam, absolutely, of the right elbow.  I mean, it's part of the basic workup of especially the new patient.
>
> If someone is complaining of pain in the joint, there should be an assessment of that joint.  Is it swollen?  Is it decrease in motion?  Is it tender?  We have none of that.

*Id.* 127:13–24.  Dr. Szabo then reviewed Mr. McKay's second visit, where Dr. Siao prescribed a 30-tablet refill, Mr. McKay's third visit, where Dr. Siao increased the prescription from 30 tablets to 70 tablets, and Mr. McKay's fourth visit, where Dr. Siao increased the prescription to 90 Norco tablets, despite no documented increase in pain. *Id.* 128:2–130:8.  Dr. Szabo concluded that the prescriptions were given to Mr. McKay without a legitimate medical reason or purpose. *Id.* at 130:17–22.

Dr. Szabo then reviewed the patient file, recordings of office visits, and prescriptions for Eric Thrasher (Agent Maher). *Id.* 131:12–134:15.  In his first visit, Mr. Thrasher claimed he had "chronic pain disorder" to which Dr. Siao  prescribed 45 Norco tablets. *Id.* 131:12–21.  Dr. Szabo testified that chronic pain disorder is not a disease that requires treatment with opioids, but instead is best treated rehabilitation and psychotherapy. *Id.* at 131:22–132:15.  At a follow-up visit, Dr. Siao increased Mr. Trasher's Norco prescription from 30 to 60 tablets under the justification that he "needs to increase Norco due to more pain from standing" and started a Marinol prescription. *Id.* at 132:16–133:6.  Dr. Szabo concluded that the prescriptions were given to Mr. Thrasher without a legitimate medical reason or purpose. *Id.* at 134:12–15.

Dr. Szabo then reviewed the patient file, recordings of office visits, and prescriptions for Doug Kiernan (Agent McGlinchey).  In his first visit, Mr. Kiernan claimed no pain, but his patient

file read "just moved from L.A. Has been on chronic pain meds," so Dr. Siao prescribed him 60 Oxycodone tablets. *Id.* 134:19–135:6. When asked if the prescription was appropriate, Dr. Szabo testified:

> No, there is nothing that indicates it was appropriate. It doesn't even indicate the patient was having pain. It just said he's been on pain meds, and we have no outside records. There's no history of any type of injury. There's no physical exam noting anything. And to start someone on oxycodone, which is quite strong, is not appropriate whatsoever.

*Id.* 135:9–14. Dr. Szabo then reviewed Mr. Kiernan's second visit, where Dr. Siao prescribed a 60-tablet refill, Mr. Kiernan's third visit, where Dr. Siao increased the prescription from 60 tablets to 75 tablets, and Mr. Kiernan's fourth visit, where Dr. Siao added a prescription for Adderall. *Id.* 135:15–138:16. When asked if the increase in Oxycodone was justified, Dr. Szabo testified "there's been nothing that justifies the initial treatment with opioids, and, therefore, an increase is not appropriate either." *Id.* 137:23–25. Dr. Szabo testified that the prescriptions were given to Mr. Kiernan without a legitimate medical reason or purpose. *Id.* 138:24–139:1.

Dr. Szabo further summarized his opinion of Dr. Siao's treatment of the UCs:

> They, again, amplified my feelings about whether these were appropriate. Just standing on the record alone, they were all inappropriate for various reasons that we discussed, and the videos really showed that the doctor was in the room for typically two minutes or so. There was no physical exam. A lot of the discussions that showed up in the reports, I didn't see them on those videos. The physical exams were never done as far as I could tell on any of the videos, and so anything that indicated there was a physical exam was put in the medical record without it being done.

*Id.* at 139:13–22. Dr. Szabo added:

> So the physical exam in these cases, there was none. There was no approach to the patient, a couple of the patients did complain of a body part pain, they were not examined. The other patients, you don't even know where their pain was and so it would be very difficult to think that giving opioids in this case was appropriate.

*Id.* at 140:12–140:17. On the question of whether it was appropriate to prescribe pills to a patient who indicated they were planning to share them with others, Dr. Szabo responded, "The answer is 100 percent no in any circumstance." *Id.* at 207:4–207:8.

Regarding E.J., Dr. Szabo testified: "Looking through [E.J.'s patient file], multiple times, I

20

was not able to find anything that indicated [she] had rheumatoid arthritis, whether a mild or

severe case." *Id.* at 143:2–143:4.  He also noted that "there were no physical exams that indicated

joint disease," "I could find nothing in the chart that indicated that the patient had any of these

abnormalities," "there were no Xrays . . . [or] outside records," and that he did not see any

indication that E.J. had received rheumatoid arthritis medication.  *Id.* at 143:2–143:19.  "So

basically the establishment of rheumatoid arthritis as a cause for providing opioids was not present

as far as I could tell."  *Id.* at 143:20–143:22.

Dr. Szabo provided similar testimony regarding A.J., noting that "similar to the other case,

there seemed to be no documentation of a clear painful diagnosis that required treatment with

controlled substances," and there were "multiple red flags in terms of the patient's behavior."  *Id.*

at 157:14–157:20.  Referring to A.J.'s patient file, Dr. Szabo further explained:

> The treatment is for Dorsalgia, unspecified. And Dorsalgia is a general term, the dorsal is the back half of the person, or it could be anything. And algia is pain. And it's a very nonspecific indication of pain in the back of his body. It doesn't specify what is hurting or where there might be any tissue changes or damage.

*Id.* at 158:21–159:1.

In its closing argument, the Government summarized its evidence and emphasized to the

jury that the conduct was unauthorized.  For example, the Government stated in the beginning of

its closing argument:

> When does a doctor become a drug dealer? The law tells you that a doctor who is authorized to prescribe controlled substances becomes a drug dealer when he or she ***distributes a federally controlled substances in an unauthorized manner*** and that that doctor either knew that or intended to do so.

Tr. 6/20/23 at 22:19–22:24 (emphasis added).  For Count One, involving Lacy Blackwell (Agent

Bloxsom):

> And if we look at the medical record, which is Exhibit 130 for Lacy Blackwell, you will see that there's no actual diagnosis made. We don't know anything about her knee, the pain, where it is, how bad it is. What is going on with the knee? We don't know.
>
> There's no documented reason for the amount that she's receiving. And keep in mind there's been no prior medical records received. There's been no verification that she actually has anything wrong with her.

> Instead we get a prescription for Xanax, which is a sedative that you heard in combination with an opioid is incredibly dangerous.
>
> And [Dr. Siao] has her sign a controlled substance agreement, but watch the video. He says he needs to have it in the patient file just in case he gets audited.
>
> There is nothing usual about that. This was an ***unauthorized distribution*** of Hydrocodone.

*Id.* at 30:13–31:13 (emphasis added). For Count Two, involving Allen McKay (Agent Martin):

> The fourth visit that we just watched [Agent Martin] indicated that he was doctor shopping. He told the defendant that he had gotten pills from a clinic in Portland and that he indicated that he was going to share those pills with his coworkers.
>
> Ladies and gentlemen, there is nothing usual about that, yet the defendant wrote a prescription to Allen McKay for 90 Norco tablets on June 18th, 2018, which is Count Two of the Superseding Indictment.
>
> If we look at the record behind the visit, some interesting things pop up that you should pay attention to when you're back in the deliberation room. According to this record, Allen McKay was physically examined.
>
> You just saw what happened during the visit. There was no physical examination that day; there was no specific discussion of pain, whether it be the elbow or the wrist; there's no documented reason for the increase, and, again, no prior medical records are ever obtained.
>
> This was an ***unauthorized distribution*** of Hydrocodone and the evidence shows that he knew that or intended it to be so.

*Id.* at 32:25–33:18 (emphasis added). For Count Three, involving Eric Thrasher (Agent Maher):

> During the second visit [Agent Maher] indicated there would be pill borrowing and pill sharing, yet the defendant, despite hearing those things, wrote a prescription for 60 Norco tablets on April 10th, 2018, which is Count Three of the Superseding Indictment.
>
> And if we look at the record documenting that visit, once again, it indicates that there was a physical examination done. Watch the video again, you will see no physical examination performed. There was also no specific discussion of pain. He said his legs were tired and stiff, once again, there are no prior medical records.
>
> There is absolutely nothing usual about this. This distribution, the evidence shows, was ***unauthorized***, and the defendant knew it or intended it to be so.

*Id.* at 34:24–35:12 (emphasis added). For Count Four, involving Doug Kiernan (Agent

22

McGlinchey):

> For Count Four on July 16th, 2018, the defendant ignored glaring red flags.
>
> The first visit [Agent McGlinchey] was requesting Oxy by street name, he knew the dosage when asked, and he indicated that he was borrowing pills.
>
> On the third visit . . . he was very clearly signaling he planned to share the pills yet the defendant wrote a prescription for 75 Oxycodone.
>
> And if we look at the medical record, it says there was a physical exam conducted. There was no physical exam [conducted] for Doug Kiernan during any visit, and there's no discussion of any specific pain. Again, there are no prior medical records.
>
> That distribution for Count Four to Doug Kiernan or Brian McGlinchey, the evidence shows was ***unauthorized***, and the defendant knew it or intended it to be.

*Id.* at 36:14–37:5 (emphasis added).  As the Government explained at closing regarding E.J. (Counts Five through Eight):

> In the record there is no specific discussion of pain. Where is she hurting? How intense is it? We don't know any of that yet the defendant writes a prescription on her very first visit with no prior history, medical history, for 90 Oxycodone. There's no workup of the other non-opioid medications, there's no trying of the ice and all of those kinds of things that you would typically see. It is not there.

*Id.* at 38:2–38:8. Similarly, for A.J. (Counts Nine through Twelve), the Government summarized as follows:

> The treatment is supposedly for Dorsalgia. You heard Dr. Szabo explain what that is. That is simply back pain. That is not a diagnosis. You do not know why his back hurts, you don't know the intensity, you don't know anything, you don't know the cause. There's no pain score and there's no treatment plan. No alternatives. We're going straight to opioids.

*Id.* at 42:5–42:11.

Dr. Siao's counsel responded during his closing argument that it was the "government's burden of proof beyond a reasonable doubt" that "the treatment that was provided by Dr. Siao was not medically appropriate and within the legitimate standards of medical practice." *Id.* at 56:20–56:24.  His counsel later added:

> Once again, if there's a disagreement with the opinion, that doesn't negate the fact that **the prosecution is still required to prove** that that opinion was not just contrary, but in violation of the standard of proof, which is that the diagnosis, **the treatment was within the medical standard of a legitimate practice**.

*Id.* at 58:7–58:12 (emphasis added).

The Court finds that even if it committed plain error in giving Instruction No. 46, Dr. Siao has not shown that a different instruction would affect the outcome of the trial. The Government's evidence that Dr. Siao's conduct was unauthorized (or equivalently, that it did not meet the "standard of care") is overwhelming.

### ii. Jury Questions Do Not Suggest Prejudice

Dr. Siao also argues that the two jury questions suggest prejudice because they were about the standard of care. Mot. at 9. In the first question the jury asked, "is there further clarification, instruction, or definition of the phrase 'outside the usual course of professional practice and without legitimate medical purpose'?" ECF No. 95-1. The second question asked, "[a]re the doctors required by law to follow the 'California Medical Board Guidelines for Prescribing Controlled Substances for Pain'?" and asked in a parenthetical if doctors would lose their license for failing to follow the guidelines. ECF No. 95-2.

Dr. Siao argues that "the instructions already provided did not inform the jurors whether or not the Government had to prove that the prescriptions in fact fell outside the standard of care." Mot. at 9–10. Dr. Siao suggests that "[t]he jurors' question about whether the law required Dr. Siao to follow the Board's Guidelines suggests debate within the jury room about whether it mattered if Dr. Siao met the standard of care." *Id.* at 10.

The Government responds, "the fact that both questions were directed to the standard of care shows that the jury understood it needed to determine whether Dr. Siao abided by it" and "had their debate been about whether it mattered, presumably that is what the jury would have asked." Opp. at 24–25.

The Court agrees with the Government. The questions asked by the jury suggest that the jury understood Instruction No. 46 to require it to find that Dr. Siao acted in an unauthorized manner. The jury was instructed that: "'Unauthorized manner' means that the distribution of the

United States District Court
Northern District of California

1   controlled substance was outside the usual course of professional practice and without a legitimate

2   medical purpose."  Instruction No. 46.  By asking question one about "the usual course of

3   professional practice" and question two about whether doctors are required to follow "California

4   Medical Board Guidelines," the jury showed an understanding of the need to determine whether

5   the conduct was "unauthorized."  Nothing from these two questions suggests that the jury did not

6   think there is a "standard of care" requirement.  To the contrary, the jury appeared to be concerned

7   with what the standard was so that it could determine whether Dr. Siao met it.

8   　　　　　　　**iii.　Jury Deliberation Time Does Not Suggest Prejudice**

9   　　　　Finally, Dr. Siao argues that 7.5 hours of deliberation "suggests that the deliberations were

10  close."  Mot. at 10.  Dr. Siao adds that "[l]engthy deliberations are a sign of a close case and weigh

11  against a finding of harmlessness."  *Id.* (citing *United States v. Lopez*, 500 F.3d 840, 846 (9th Cir.

12  2007), *Kennedy v. Lockyer*, 379 F.3d 1041, 1056, n.18 (9th Cir. 2004), *Dyas v. Poole*, 317 F.3d

13  934, 937 (9th Cir. 2003)).

14  　　　　The Government "disagrees that the jury deliberations were uncharacteristically long given

15  the nature of the trial" because "Dr. Siao was charged with twelve counts, the Government

16  presented over ten witnesses (including three expert witnesses), and the jury had numerous videos

17  and hundreds of pages of patient files it may have wanted to review, in addition to other exhibits."

18  Opp. at 25.  The Government adds that "even if the deliberations were uncharacteristically long,

19  that could just as easily suggest that the jurors were grappling with more rather than fewer

20  elements—including the need to determine whether Dr. Siao acted in an unauthorized manner."

21  *Id.*

22  　　　　The Court agrees with the Government.  The deliberations were not uncharacteristically

23  long.  In the Court's experience, jurors sitting in serious criminal trials often deliberate for four to

24  five days before reaching a verdict.

25  　　　　　　　　　　　　*　　　*　　　*

26  　　　　In sum, the Court concludes that even if it committed plain error in giving Instruction No.

27  46, any error did not affect substantial rights when considering the full circumstances of the trial.

28  \\

　　　　　　　　　　　　　　　25

**IV.     ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that Dr. Donald Siao's Motion for a New Trial is DENIED.


Dated: November 9, 2023

_____
BETH LABSON FREEMAN
United States District Judge